Filed 12/4/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| In re HECTOR MARTINEZ | ) | S226596 |
| | ) | |
| on Habeas Corpus. | ) | Ct.App. 4/1 D066705 |
| | ) | |
| | ) | San Diego County |
| | ) | Super.Ct. No. SCD224457 |
| _____ | ) | |

Petitioner Hector Martinez was convicted of first degree murder after the jury was instructed on both a direct aiding and abetting theory and a natural and probable consequences theory. After his conviction, we held in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*) that a natural and probable consequences theory of liability cannot serve as a basis for a first degree murder conviction. It is undisputed that the trial court in this case committed *Chiu* error. The sole question is whether the error was prejudicial. We hold that on a petition for writ of habeas corpus, as on direct appeal, *Chiu* error requires reversal unless the reviewing court concludes beyond a reasonable doubt that the jury actually relied on a legally valid theory in convicting the defendant of first degree murder. Because we are unable to reach such a conclusion based on the record here, we vacate Martinez's first degree murder conviction.

## I.

Martinez was convicted of the first degree murder of Guillermo Esparza (Pen. Code, § 187, subd. (a) (all undesignated statutory citations are to this code)), assault of Esparza with a semiautomatic firearm (§ 245, subd. (b)(1)), and assault of Jimmy Parker with force likely to cause great bodily injury (§ 245,

**SEE CONCURRING OPINION**

subd. (a)(1)). In a general verdict, the jury found true allegations that each crime was committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)); that Martinez was vicariously armed with a firearm in the commission of the murder (§ 12022, subd. (a)(1)); that the codefendants were principals in the commission of the murder; and that a principal used a firearm and proximately caused great bodily injury and death (§ 12022.53, subds. (d), (e)(1)). The trial court sentenced Martinez to a determinate term of six years plus an indeterminate term of 50 years to life.

The facts of the crime committed by Martinez and his codefendant Darren Martinez (no relation to petitioner) are summarized by the Court of Appeal as follows: Late in the evening on August 20, 2009, Darren's girlfriend was with Darren and Martinez when she saw Darren with a gun. She objected to his having a gun at her house and asked him to take the gun away. Darren, accompanied by Martinez, left the house but did not dispose of the gun. A few hours later, Martinez, Darren, and Darren's girlfriend were in her car at a drive-thru restaurant. She noticed a gun in Darren's lap. When she was driving home, Darren suddenly told her to stop the car. Martinez and Darren got out of the car and ran up to Jimmy Parker and Guillermo Esparza, who were walking down the street. Martinez asked Parker, "Where are you from?" Parker mentioned the name of a group that was not a gang but was engaged in tagging. Martinez punched Parker, and they fought. Parker heard Darren say, "This is Lomas," and Darren shot Esparza, who died as a result. Martinez hit Parker once more after the gunshot was fired. Martinez and Darren then ran from the crime scene.

At trial, Detective Nestor Hernandez testified that Martinez and Darren were documented Lomas gang members, that gang members commonly carried weapons when preparing to assault someone or enter rival gang territory, that the question "where are you from?" is a challenge to those perceived to be trespassing

2

on gang territory, and that gang members can be expected to stand up for one another.

The court instructed the jury with CALCRIM Nos. 400 and 401 regarding aiding and abetting, and with CALCRIM No. 403 regarding the natural and probable consequences doctrine. CALCRIM No. 403 provides in part: "To prove that a defendant is guilty of murder, the People must prove that: [¶] 1. The defendant is guilty of assault and/or battery; [¶] 2. During the commission of assault and/or battery, a coparticipant in that assault and/or battery committed the crime of murder; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the assault and/or battery."

Martinez timely appealed, contending among other things that his first degree murder conviction should be reversed because the trial court's instruction on the natural and probable consequences doctrine "failed to correctly inform the jury that [the defendants were] guilty of premeditated murder only if the jury found that premeditated murder, and not merely murder, was the natural and probable consequence of the target crimes." The Court of Appeal rejected that argument based on its reading of *People v. Favor* (2012) 54 Cal.4th 868, 878–880. We denied Martinez's petition for review without prejudice to any relief he might obtain under *Chiu*, which was pending before this court at the time. We subsequently held in *Chiu* that a natural and probable consequences theory cannot be a basis for convicting a defendant of first degree murder. (*Chiu*, *supra*, 59 Cal.4th at p. 166.)

Martinez filed this writ petition in the Court of Appeal, arguing that he is entitled to have his conviction reduced to second degree murder under *Chiu*. While recognizing that the jury instruction on natural and probable consequences

3

was error under *Chiu*, the Court of Appeal affirmed Martinez's first degree murder conviction because it was supported by "sufficient evidence." We granted review to address the proper standard of prejudice for *Chiu* error on a petition for writ of habeas corpus.

## II.

In *Chiu*, we said that "the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the . . . public policy concern of deterrence. [¶] Accordingly, we hold that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine. We further hold that where the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*Chiu*, *supra*, 59 Cal.4th at p. 166.)

We went on to say: "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1128–1129; *People v. Green* (1980) 27 Cal.3d 1, 69–71.) Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Chiu*, *supra*, 59 Cal.4th at p. 167.)

4

The Attorney General contends that a different standard of prejudice should apply with respect to *Chiu* error when a defendant seeks to attack his conviction not by direct appeal, as in *Chiu*, but collaterally through a petition for writ of habeas corpus. The Attorney General relies on a line of our earlier cases in which we said: "Habeas corpus is available in cases where the court has acted in excess of its jurisdiction. [Citations.] For purposes of this writ as well as prohibition or certiorari, the term 'jurisdiction' is not limited to its fundamental meaning, and in such proceedings judicial acts may be restrained or annulled if determined to be in excess of the court's powers as defined by constitutional provision, statute, or rules developed by courts. [Citations.] In accordance with these principles a defendant is entitled to habeas corpus *if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct.*" (*In re Zerbe* (1964) 60 Cal.2d 666, 667–668 (*Zerbe*), italics added; see *People v. Mutch* (1971) 4 Cal.3d 389, 396 (*Mutch*) [applying same standard]; *In re Earley* (1975) 14 Cal.3d 122, 125 (*Earley*) [same].)

In determining the prejudicial effect of *Chiu* error in a habeas corpus proceeding, the Courts of Appeal have differed on the appropriate standard. (See *In re Johnson* (2016) 246 Cal.App.4th 1396, 1406 [adopting *Chiu* standard of prejudice and rejecting the standard set forth in the "older line of habeas corpus cases"]; *In re Lopez* (2016) 246 Cal.App.4th 350, 360–361 [*Zerbe* and *Mutch* set forth the proper standard for determining whether *Chiu* error is prejudicial in a habeas corpus proceeding].)

The justification for requiring habeas corpus petitioners to meet a more demanding standard of prejudice was explained by Justice Traynor in *In re Bell* (1942) 19 Cal.2d 488. *Bell* involved a county ordinance prohibiting labor picketing. A portion of the ordinance prohibiting peaceful picketing was clearly

5

unconstitutional, whereas another portion prohibiting various acts of violence was clearly constitutional. (*Id.* at pp. 496–498.) The general verdict on its face was ambiguous as to which portions of the ordinance the petitioners were convicted of violating. The court recognized that "[t]he ambiguity of the judgment in the present case would thus clearly warrant a reversal of the conviction on appeal or other direct attack." (*Id.* at p. 500, citing *Stromberg v. California* (1931) 283 U.S. 359, 363.) But the petitioners in *Bell* had exhausted their appeals, and habeas corpus "is in the nature of a collateral attack, and a judgment that is collaterally attacked carries with it a presumption of regularity. [Citation.] . . . The presumption, however, is not conclusive in a habeas corpus proceeding but places upon petitioners the burden of proving that their convictions were based not upon the constitutional but upon the unconstitutional provisions of the ordinance. [Citation.] Unless they can sustain this burden they must be considered as having been convicted of violating the valid provision relating to acts of violence, and the judgment must be upheld." (*Bell*, at pp. 500–501.) In order to carry this burden, a petitioner may rely on evidence outside the trial record. (*Id.* at p. 504.)

As we have emphasized, this presumption of regularity stems from the recognition that " 'habeas corpus is an extraordinary remedy "and that the availability of the writ properly must be tempered by the necessity of giving due consideration to the interest of the public in the orderly and reasonably prompt implementation of its laws and to the important public interest in the finality of judgments." ' " (*In re Reno* (2012) 55 Cal.4th 428, 451.) The interest in finality has led this court to develop various procedural bars to collateral attacks on the judgment. The bar most relevant to this case is the so-called *Waltreus* rule: A writ of habeas corpus will not issue for a claim that was raised and rejected on appeal. (*Reno*, at p. 476; see *In re Waltreus* (1965) 62 Cal.2d 218, 225 (*Waltreus*).) There are exceptions to this rule. One such exception applies "when

6

there has been a change in the law affecting the petitioner." (*In re Harris* (1993) 5 Cal.4th 813, 841 (*Harris*).) To trigger this exception, the change in the law must have retroactive effect. We have said that a change in the criminal law will be given retroactive effect when a rule is substantive rather than procedural (i.e., it alters the range of conduct or the class of persons that the law punishes, or it modifies the elements of the offense) or when a judicial decision undertakes to vindicate the original meaning of the statute. (*In re Lopez* (2016) 246 Cal.App.4th 350, 357–359.) Here, as the Attorney General concedes, *Chiu* is retroactive. (See *id.* at p. 359.)

The application of procedural bars and limitations on the retroactivity of changes in the criminal law serves to protect the finality of judgments on collateral review. The Attorney General argues that even when a petitioner has surmounted these hurdles, as is the case here, the imposition of an additional hurdle — a heightened standard of prejudice that a habeas corpus petitioner must meet — is necessary to safeguard finality. But the case law applying the heightened standard does not support this position. In many of the cases cited by the Attorney General, there was no change in the law, and the court was simply asked to review a constitutional claim rejected on appeal. (See *Bell*, *supra*, 19 Cal.2d at p. 495; *In re Klor* (1966) 64 Cal.2d 816, 817–818, 822; *Zerbe*, *supra*, 60 Cal.2d at p. 667.) As noted, the courts in these cases assigned habeas corpus petitioners "the burden of proving that their convictions were based not upon the constitutional but upon the unconstitutional provisions of the ordinance" (*Bell*, at p. 501) or the burden of showing that "there is no material dispute as to the facts relating to his conviction and . . . the statute under which he was convicted did not prohibit his conduct" (*Zerbe*, at p. 668). These standards generally correspond to two other exceptions to the *Waltreus* rule. First, "where the claimed constitutional error is both clear and fundamental, and strikes at the heart of the trial process . . . an opportunity for

7

a third chance at judicial review (trial, appeal, postappeal habeas corpus) [is] justified." (*Harris*, *supra*, 5 Cal.4th at p. 834.)  Second, review of a previously litigated claim is justified where the trial court acted in excess of jurisdiction and " 'there [was] no material dispute as to the facts.' " (*Id.* at p. 840, citing *Zerbe*, at p. 668.)

Other cases cited by the Attorney General did involve a change of law.  In *Mutch*, *supra*, 4 Cal.3d 389, petitioner sought relief from a kidnapping conviction in connection with a robbery pursuant to section 209 after this court clarified in *People v. Daniels* (1969) 71 Cal.2d 1119, 1139, that such a conviction could not be based on "movements of the victim [that] are merely incidental to the commission of the robbery . . . ." (*Mutch*, at p. 394; see *ibid.* [*Daniels* overruled the contrary rule on kidnapping set forth in *People v. Chessman* (1951) 38 Cal.2d 168, 192].)  In *Mutch*, the court first determined that *Daniels*'s construction of section 209 should be given retroactive effect because *Daniels* had not redefined the crime of kidnapping but simply declared what the Legislature's intent had been in enacting the 1951 amendment to section 209.  (*Mutch*, at p. 394.)  The court then recapitulated the *Zerbe* standard that a habeas corpus petitioner is entitled to relief only " 'if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct.' " (*Id.* at p. 396.)  In *Mutch*, the petitioner was able to meet that burden. (*Id.* at p. 399.)  In *Earley*, a case in which the same issue was raised and the same standard of prejudice articulated, the petitioner was not able to meet the burden, and we denied relief.  (*Earley*, *supra*, 14 Cal.3d at pp. 125, 132–133.)

Unlike the present case, the petitioners in *Mutch* and *Earley* claimed they were actually innocent of kidnapping under section 209 because the statute did not proscribe their conduct.  (*Mutch*, *supra*, 4 Cal.3d at p. 395 ["the issue is 'whether the acts of [defendant], on the record in this case, constitute the kind of conduct

8

proscribed by section 209' "]; *Earley*, *supra*, 14 Cal.3d at p. 125 [petitioner seeks relief "on the ground that his conduct did not violate section 209" as construed in Daniels].)  In evaluating this claim, the court applied the rule established in *Zerbe* that "a defendant is entitled to habeas corpus if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct." (*Zerbe*, *supra*, 60 Cal.2d at p. 668.) The granting of relief in such circumstances would in effect be a holding that there was insufficient evidence to convict the petitioner of kidnapping when section 209 was properly construed, and it would therefore bar retrial on the kidnapping charge.  (See *People v. Eroshevich* (2014) 60 Cal.4th 583, 591.)

Martinez's claim is different.  He contends the jury was improperly instructed on what constitutes aiding and abetting a first degree murder.  Such an erroneous instruction deprives a defendant of the right to a jury trial under the Sixth Amendment to the United States Constitution; that right implies a right to a jury properly instructed in the relevant law.  (See *Neder v. United States* (1999) 527 U.S. 1, 12.)  A reversal of his conviction on that basis does not bar retrial. (See *People v. Collins* (1992) 10 Cal.App.4th 690, 698.)  A petitioner in these circumstances does not carry the burden of demonstrating that his conviction was based on insufficient evidence.  Rather, once he has shown that the jury was instructed on correct and incorrect theories of liability, the presumption is that the error affected the judgment:  " 'Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law — whether, for example, the action . . . fails to come within the statutory definition of the crime.  When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.' " (*People v Guiton* (1993) 4 Cal.4th 1116, 1125, quoting *Griffin v. United States* (1991) 502 U.S. 46, 59.)  Of course,

9

the presumption of error can be rebutted by a showing "beyond a reasonable doubt that the jury based its verdict on the legally valid theory." (*Chiu*, *supra*, 59 Cal.4th at p. 167.)

Thus, both the nature and the procedural posture of the claim presented in this case distinguishes it from the claims considered in the cases on which the Attorney General relies. Because the claim was presented after a change in the law given retroactive effect, it is not barred by *Waltreus* or any other procedural rule designed to safeguard the finality of judgments against collateral attack. And the claim does not allege actual innocence or insufficiency of the evidence; it alleges a deprivation of the right to have a jury properly decide a defendant's culpability. Under these circumstances, it is inappropriate to place on a habeas corpus petitioner the burden of proving that the jury relied on the legally incorrect theory in order to vindicate his constitutional right to a jury trial. We hold that such a habeas corpus petitioner is in the same position as a defendant raising this type of error on direct appeal, and the same rule should apply: The "first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Chiu*, *supra*, 59 Cal.4th at p. 167.) We express no view on whether the same rule would apply to an individual asserting the same claim in a habeas corpus petition when there has been no intervening change in the law (cf. *Bell*, *supra*, 19 Cal.2d at pp. 500–501) or whether such a claim would fit into some other exception to the *Waltreus* rule.

The Attorney General argues in the alternative that we should adopt the federal standard of prejudice articulated in *Hedgpeth v. Pulido* (2008) 555 U.S. 57, derived from *Brecht v. Abrahamson* (1993) 507 U.S. 619, 637 (*Brecht*). Under this standard, a collateral attack on a state court judgment in a federal habeas corpus proceeding on the ground that the jury had been instructed on legally valid

10

and invalid theories will succeed only if the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " (*Hedgpeth*, at p. 58.) The high court has further clarified that neither party has a burden of proof or persuasion, but that reversal of the verdict is required where "a conscientious judge is in grave doubt as to the harmlessness of an error." (*O'Neal v. McAninch* (1995) 513 U.S. 432, 437.)

The federal standard is based in part on the concern for preserving the finality of judgments against collateral attack. (See *Brecht*, *supra*, 507 U.S. at p. 637.) But it is not clear that what amounts to a "grave doubt" standard of prejudice is fairer or more workable than the beyond a reasonable doubt standard articulated in *Guiton* and *Chiu*. At least with respect to the type of claim that Martinez raises in this case, the state law framework discussed above sufficiently addresses such finality concerns and properly balances those concerns with the need to correct serious constitutional error on collateral review. We decline to adopt the federal standard.

### III.

In this case, the Court of Appeal correctly recited the *Chiu* prejudice standard. But the court did not go on to inquire whether it could conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that Martinez directly aided and abetted the premeditated murder. Rather, it concluded there was "sufficient evidence" that Martinez acted as a direct aider and abettor: "Martinez was aware the codefendant carried a gun in the vehicle because he was aware the codefendant had it earlier, and after the girlfriend had told the codefendant to remove it from her house, Martinez accompanied the codefendant who had promised to dispose of it. Further, the gang expert's testimony provided the jury with a basis to find that Martinez likely was emboldened to challenge Parker and Esparza—by asking them where they were from—precisely because

11

Martinez knew the codefendant was carrying a gun and Martinez relied on his codefendant's support as he attacked the others. Further, Martinez's use of violence would enhance the respect he received within the gang and for the gang among rival gangs. Lastly, Martinez encouraged and facilitated the first degree murder by attacking Parker, thus simultaneously preventing Parker from defending Esparza, and freeing up the codefendant to focus exclusively on Esparza, which the codefendant did by shooting and killing him."

The Court of Appeal's analysis, while showing that the jury could reasonably have found Martinez guilty as a direct aider and abettor of the murder of Esparza, does not show beyond a reasonable doubt that the jury actually relied on that theory. We conclude that the record does not permit us to rule out a reasonable possibility that the jury relied on the invalid natural and probable consequences theory in convicting Martinez of first degree murder.

An instruction on an invalid theory may be found harmless when "other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary" under a legally valid theory. (*People v. Chun* (2009) 45 Cal.4th 1172, 1205.) The Attorney General points to nothing in the verdict showing beyond a reasonable doubt that the jury made the findings necessary to convict Martinez as a direct aider and abettor. The Attorney General's position, like the Court of Appeal's, is based on its review of the evidence. But the evidence in this case does not compel the conclusion that the jury must have relied on a direct aider and abettor theory.

The evidence shows that Martinez was engaged in a fight with Parker and that the only assistance he rendered to his codefendant was incidental to his assault on Parker — that is, his assault prevented Parker from coming to Esparza's assistance. Although the Court of Appeal and the Attorney General may be correct that there is sufficient evidence to convict Martinez of directly aiding and

12

abetting, the evidence also supports the theory that the murder was a natural and probable consequence of the assaults that Martinez and his codefendant committed.

This conclusion is bolstered by the fact that the prosecutor argued the natural and probable consequences theory to the jury at length during closing argument and rebuttal. Moreover, an inquiry by the jury during its deliberations suggested that it was considering the natural and probable consequences theory of liability. The jury asked to clarify the meaning of the instruction regarding "Aiding and Abetting: Intended Crimes," which states: "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids* and *abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." (CALCRIM No. 401.)

The jury sent the court a note that said: "Clarification request on description of #401 Aiding and Abetting: [¶] Point #2 says: 'The defendant knew that the perpetrator intended to commit the crime,' [¶] What is meant by 'the crime'? Did aider and abett[or] have to know or even expect the possibility that it will be murder (for count #1)? Or does it mean any crime?" The court replied, "This is what the jury has to decide. Refer to instructions 400, 401 and 403, read together." The court added, " '[A]ny crime' means any crime the defendants are on trial for.' " The jury's query and the trial court's response, with its reference to the natural and probable consequences instruction (CALCRIM No. 403), suggest

13

that some of the jurors' ambivalence about convicting Martinez on a direct aiding and abetting theory may have been resolved by relying on the theory that the murder was a natural and probable consequence of the assaults committed by Martinez and his codefendant.

In sum, we conclude that the Attorney General has not shown beyond a reasonable doubt that the jury relied on a legally valid theory in convicting Martinez of first degree murder.

## CONCLUSION

Because the *Chiu* error here was prejudicial, we reverse the judgment of the Court of Appeal and remand with directions to enter an order granting Martinez habeas corpus relief and vacating his conviction for first degree murder. If the prosecution elects not to retry Martinez, the trial court shall enter judgment reflecting a conviction of second degree murder and sentence him accordingly.

**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**JOHNSON, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15

**CONCURRING OPINION BY KRUGER, J.**

At Hector Martinez's trial for first degree murder, the jury was instructed on two alternative theories of guilt, both based on Martinez's having aided and abetted a killing perpetrated by his codefendant. This court's later decision in *People v. Chiu* (2014) 59 Cal.4th 155 made clear that one of those theories—the so-called natural and probable consequences theory—was invalid. Invoking *Chiu*, Martinez now petitions for a writ of habeas corpus. The Attorney General opposes the grant of relief. He argues that it is Martinez's burden to establish that he could not have been found guilty under the remaining, legally valid theory, and Martinez has not sustained that burden. I agree with the majority that it is not Martinez's burden to prove this negative; it is enough that the jury realistically could have relied on the invalid theory in rendering its verdict. Martinez is entitled to a new trial before a properly instructed jury.

I write separately to explain why, in my view, this court's cases do not support the far more demanding rule the Attorney General proposes. Martinez raises a claim of what is sometimes called alternative theory error: He challenges his conviction on the basis that the jury in his case "was instructed on alternative theories of guilt and may have relied on an invalid one." (*Hedgpeth v. Pulido* (2008) 555 U.S. 57, 58 (*Hedgpeth*); see, e.g., *Stromberg v. California* (1931) 283 U.S. 359 (*Stromberg*).) As the majority points out, many of the cases on which the Attorney General relies involved a different sort of claim: that is, a claim to

unconditional release on grounds that the defendant was actually innocent of the crime of which he was convicted. (Maj. opn., *ante*, at pp. 8–9.) The context is important. For example, when the court in *People v. Mutch* (1971) 4 Cal.3d 389, 396 noted that " 'a defendant is entitled to habeas corpus . . . if it appears that the statute under which he was convicted did not prohibit his conduct,' " the context makes clear that the court was merely acknowledging that the defendant's claim of innocence in that case, if sustained, would entitle him to the relief he sought. The court was not, as the Attorney General would have it, requiring all habeas petitioners to prove their innocence in order to secure relief from a jury verdict rendered unreliable by flawed instructions.

I would place *In re Bell* (1942) 19 Cal.2d 488 (*Bell*) in a different category, however. The petitioners in *Bell* had been convicted of violating an anti-picketing ordinance that they challenged as unconstitutional. On appeal, the superior court (which was the highest court to which petitioners could appeal) rejected the constitutional challenge and affirmed petitioners' convictions. (*Id.* at p. 491.) Petitioners then renewed the constitutional challenge in habeas corpus petitions filed in the superior court, the Court of Appeal, and, ultimately, this court. The threshold question before this court was whether the constitutionality of the ordinance could be tested by a habeas petition, despite the traditional view that habeas corpus lies only to test the jurisdiction of the court whose judgment is challenged and not to correct errors committed in the exercise of that jurisdiction. (*Id.* at p. 492.) Answering that question in the affirmative, this court proceeded to strike down provisions of the ordinance prohibiting peaceful picketing, while upholding one provision insofar as it prohibited picketing by acts of violence. (*Id.* at pp. 496–498.)

This partial invalidation created something of a dilemma, because the record in the petitioners' case did not specify which provision—the valid one or

2

the invalid one—formed the basis of their conviction. (*Bell*, *supra*, 19 Cal.2d at p. 499.) The court acknowledged that had the case arisen on direct review, this ambiguity would have warranted reversal of the conviction. (*Id.* at p. 500, citing *Stromberg*, *supra*, 283 U.S. at p. 368.) The court also acknowledged that if the statute had been held "entirely unconstitutional," then petitioners would have been entitled to release from custody. (*Bell*, at p. 498.) But because the claim arose on habeas corpus, and because the statute of conviction was only partly invalid, the court reasoned that petitioners were entitled to relief only if it was "clear" that they were not convicted of violating the valid portion of the statute. (*Id.* at p. 499, citing *Ex parte Morrison* (1891) 88 Cal. 112 (*Morrison*).) Applying that rule, the court concluded that petitioners "failed to sustain the burden of proving that they were not tried and convicted" under the valid portion of the anti-picketing ordinance because the record revealed evidence of violent acts. (*Bell*, at p. 504.)

Unlike the other cases on which the Attorney General relies, *Bell* does suggest that a reasonably convincing claim of actual innocence under any valid theory of liability is a prerequisite to habeas relief when a jury has rendered a general verdict after being presented with both valid and invalid theories. And I, unlike the majority, do not think the suggestion is readily cabined to claims not "presented after a change in the law given retroactive effect." (Maj. opn., *ante*, at p. 10.) After all, there had been a retroactive change in the law in *Bell*, too: The anti-picketing ordinance, which had been upheld in petitioners' case on direct review, was ruled unconstitutional in part on habeas. I do not see why it matters that petitioners sought habeas relief in the very same case in which the constitutional ruling was rendered, rather than invoking a favorable constitutional ruling rendered in some other case involving some other set of picketers.

The more pertinent point about *Bell*, as I see it, is that it was decided under the influence of authorities taking a different view of the scope of the writ of

3

habeas corpus than we now hold.  Today we understand habeas generally to
" 'permit[] judicial inquiry into a variety of constitutional and jurisdictional
issues,' " acting as a " 'safety valve' . . . for cases in which a criminal trial has
resulted in a miscarriage of justice." (*In re Reno* (2012) 55 Cal.4th 428, 450.)  But
as noted, the traditional view was that habeas corpus existed only to test the
jurisdiction of the court whose judgment is challenged and not to correct errors
committed in the exercise of that jurisdiction.  (*Bell*, *supra*, 19 Cal.2d at p. 492;
see also, e.g., *In re Reno*, *supra*, at p. 450.)

Of course, by the time *Bell* was decided, courts had begun to recognize that
this rule had become "more a fiction than anything else" (*Wainwright v. Sykes*
(1977) 433 U.S. 72, 79), and *Bell* itself recognized the trend toward using habeas
"to test the constitutionality not only of a statute but of the procedure in
petitioner's trial, even though the trial court has jurisdiction to try the petitioner"
(*Bell*, *supra*, 19 Cal.2d at p. 493).  But in adopting its restrictive approach to a
claim of alternative theory error raised on habeas, *Bell* reached well back into the
old regime, relying on a one-paragraph 1891 opinion holding that a habeas
petitioner was not entitled to release where it was unclear that he had been
convicted under the invalid portion of a partially invalid statute.  (*Morrison*, *supra*,
88 Cal. 112, cited in *Bell*, *supra*, at p. 499.)  The underlying premise of that
opinion was that habeas provided a vehicle for relief from convictions that were
"void," such as a conviction entered under an invalid statute, but not as a vehicle
for the correction of errors committed by a court with jurisdiction over the person
and the subject matter.  (See, e.g., *Ex parte Mirande* (1887) 73 Cal. 365, 371;
*Morrison*, at p. 112.)  *Bell* itself represented an important chapter in the story of
the expansion of habeas beyond this historical understanding.  But as *Bell*'s
reliance on *Morrison* indicates, the analysis had not entirely caught up with these
developments.

4

*Bell* also, as the majority notes, invoked the notion that a judgment that is collaterally attacked on habeas carries with it a presumption of regularity. (*Bell*, *supra*, 19 Cal.2d at pp. 500–501; see maj. opn., *ante*, at p. 6.) But the presumption of regularity alone does not explain *Bell*'s choice to analyze the claim in that case as limited to a claim that the convictions had been entered under an invalid portion of the ordinance, nor does it otherwise justify erecting such a high bar to relief in cases of alternative theory error. The presumption of regularity, we have since explained, is designed to protect society's legitimate interest in the finality of its criminal judgments: "If a criminal defendant has unsuccessfully tested the state's evidence at trial and appeal and wishes to mount a further, collateral attack, ' "all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; *defendant* thus must undertake the burden of overturning them. Society's interest in the finality of criminal proceedings so demands[.]" ' " (*In re Reno*, *supra*, 55 Cal.4th at p. 451.) Here, Martinez has discharged that burden by demonstrating that the jury at his trial received instructions that were later exposed as flawed in *Chiu*. The presumption of regularity does not require Martinez to bear the further burden of proving that this admitted irregularity led the jury to return a verdict that no properly instructed jury conceivably could have rendered.

Since *Bell* was decided, it has been sparingly invoked for the rule that the Attorney General urges here; in *In re Klor* (1966) 64 Cal.2d 816, 822, the court cited *Bell* under comparable circumstances but found its exacting standard to be satisfied. At this point, many decades later, it seems appropriate to recognize that the standard is rooted in an outmoded understanding of the scope of the writ and should no longer be followed. I would disapprove *In re Bell* (1942) 19 Cal.2d 488, and *In re Klor* (1966) 64 Cal.2d 816, to the extent they are inconsistent with this conclusion.

The Attorney General also argues in the alternative that even if Martinez need not show that he could not have been convicted under a valid theory, we should adopt the harmlessness standard that applies in federal habeas proceedings, which would require Martinez to show that the flawed jury instructions " 'had substantial and injurious effect or influence in determining the jury's verdict.' " (*Hedgpeth*, *supra*, 555 U.S. at p. 58, quoting *Brecht v. Abrahamson* (1993) 507 U.S. 619, 623.) Under that standard, a jury verdict may be reversed if a court has "grave doubt" as to whether the verdict would have been the same absent the error. (*O'Neal v. McAninch* (1995) 513 U.S. 432, 436–437.) For the reasons the majority gives, I think this standard would be satisfied here: The facts of the case, the prosecutor's reliance on the natural and probable consequences doctrine at argument and rebuttal, and the jury's inquiry during deliberations all at least give rise to grave doubt about the effect of the erroneous instruction on the jury's verdict. (See maj. opn., *ante*, at pp. 10–11.) But we are not bound to adopt this federal standard, and I agree with the majority that it is unnecessary to introduce yet another harmlessness standard into California law in order to safeguard finality interests already accounted for elsewhere in the state law habeas framework. I accordingly concur.

**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Martinez
_____

**Unpublished Opinion** XXX NP opn. filed 5/15/15 – 4th Dist., Div. 1
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S226596
**Date Filed:** December 4, 2017
_____

**Court:** Superior
**County:** San Diego
**Judge:** Robert F. O'Neill


_____

**Counsel:**

Marilee Marshall & Associates and Marilee Marshall for Petitioner Hector Martinez.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Donald E. de Nicola, Deputy State Solicitor General, Lise Jacobson and Kimberley A. Donohue, Deputy Attorneys General, for Respondent State of California.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Marilee Marshall
Marilee Marshall & Associates
595 E. Colorado Boulevard, Suite 324
Pasadena, CA  91110
(626) 564-1136

Kimberley A. Donohue
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-3196