# IN THE SUPREME COURT OF CALIFORNIA

In re TYREE FERRELL
on Habeas Corpus.

S265798

April 6, 2023

Justice Jenkins authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Groban, and Evans concurred.

In re TYREE FERRELL

S265798


Opinion of the Court by Jenkins, J.


Jury instructions erroneously permitted the second degree murder conviction of petitioner Tyree Ferrell based on a felony-murder theory invalidated by *People v. Chun* (2009) 45 Cal.4th 1172 (*Chun*). The jury's unadorned guilty verdict does not show it avoided this now-invalid theory. The Secretary of the Department of Corrections and Rehabilitation nevertheless argues the instructional error was harmless and asks us to uphold Ferrell's conviction. The Secretary argues the jury's additional finding — that Ferrell intentionally discharged a firearm and caused death in committing his offense (Pen. Code, § 12022.53, subd. (d)) — along with the evidence adduced at trial, show that any rational jury would have found Ferrell guilty under a valid theory of second degree murder, implied malice.

We conclude that, whether viewed in isolation or in light of the entire record, the jury's additional finding fails to establish the mental component of implied malice, which requires a defendant to act with a conscious disregard for life, knowing his act endangers another's life. The jury could have, consistent with its additional finding, concluded Ferrell shot Lawrence Rawlings, his childhood friend, while trying to stop a fight without believing he was shooting towards any person. This scenario would not demand a finding of implied malice. We therefore cannot say beyond a reasonable doubt that a jury properly instructed without the erroneous felony-murder

1

instructions would have still returned a second degree murder verdict. We accordingly grant Ferrell relief pursuant to his petition for habeas corpus.

## I.    FACTS

### A.    Rawlings Is Killed.

A gambling dispute incited a fist fight between two Blood gang subsets, "All For Crime" (AFC) and "40 Piru." These two subsets were "kind of alright" and could "get along" while gambling, but sometimes arguments arose that spilled into fights in the nature of "athletic contests" with "bloody lips, that's all." On this occasion, Ferrell, Ferrell's friend Lawrence Rawlings, and Henry Keith fought for AFC. Rawlings' girlfriend and cousin both observed the fight.

Cussondra Davis, Rawlings' girlfriend, believed the fighting was "completely over" and saw gang members shaking hands, hugging, and making up. Rawlings, according to Davis' testimony, had finished hugging a 40 Piru nicknamed Diggum when she observed Ferrell shoot a gun in the direction of the 40 Pirus. She described Ferrell as holding his shooting arm at a right angle to his body — that is, parallel to the ground — and moving his arm back and forth. Davis saw Ferrell fire a second shot with his arm in this same position. No 40 Pirus, however, were struck. Instead, Davis saw her boyfriend, Rawlings, lying on the ground, bloodied. Davis watched Ferrell drop the gun and flee.

Latesha Rawlings, meanwhile, saw Ferrell pointing a gun toward her cousin, Rawlings. She too thought the fighting had stopped. She then saw Ferrell discharge "maybe three shots" — his shooting arm outstretched, "bouncing" or "going all kinds of ways like he couldn't handle the gun." Rawlings fell to the

ground, and Ferrell ran to him, saying "he was sorry, that he didn't mean to do it."

Ferrell fled the state after the shooting, but when police located him, he voluntarily spoke to officers. He admitted being at the fight and firing the gun but claimed he "shot one time into the air, and the second time it just went off." He "was trying to break up the fight." In particular, he hoped to stop a skirmish his friend Rawlings had been losing. Ferrell asserted he "didn't point" the gun "at anybody." Rather, he kept the gun barrel pointed to "the air" the "whole time," even as he brought his arm down from over his head. Rawlings, explained Ferrell, could only have been shot by "accident." When asked how Rawlings could get shot if Ferrell had been pointing in the air, Ferrell responded, "I don't know, I just seen him standing there, then he just fell, that's when I ran to him and I was holding him, and everybody told me I hit him and I left." Asked a second time, Ferrell said, "accident, 'cause he was running and everything was just . . . I don't know it was just."

Henry Keith, who had fought alongside Ferrell, believed Ferrell's first shot was into the air. He heard the first shot, saw Ferrell's arm coming down, and heard a second shot. He "didn't see nothing aimed at nobody." Keith then saw Rawlings on the ground. Ferrell went over to Rawlings and said he "didn't mean it." Keith believed some fighting was still ongoing when the shooting occurred.

## B. Ferrell Is Convicted.

Though Ferrell was 17 years old at the time he shot Rawlings, the juvenile court deemed Ferrell unfit for rehabilitation in that system and transferred him to a court of criminal jurisdiction. (See Welf. & Inst. Code, § 707.) The

People then charged Ferrell with murder (Pen. Code, § 187, subd. (a)) and alleged sentencing enhancements related to his use of a firearm (Pen. Code, § 12022.53, subds., (b)–(d)).[1] Davis and Latesha Rawlings testified for the prosecution while Keith testified for the defense. Ferrell did not testify, but his statements to police were admitted into evidence. Amongst other witnesses, a medical examiner testified that assuming Rawlings was upright when shot, the bullet that struck him travelled parallel to the ground. Only if Rawlings' head had been angled such that its left side faced skyward could the bullet have come from the sky.

The prosecutor, in closing argument, told jurors they could find Ferrell guilty of first or second degree murder, or, at minimum, involuntary manslaughter. The prosecutor offered three possible theories of second degree murder: (1) express malice murder, requiring an intent to kill; (2) implied malice murder, requiring an intentional act whose natural consequences are dangerous to human life, and which was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life; and (3) felony murder, premised on the killing occurring during a felony, namely the willful discharge of a firearm in a grossly negligent manner in violation of Penal Code section 246.3. The court instructed the jury on each of these theories of second degree murder, as well as first degree murder (see Pen. Code, § 189, subd. (a) [a "willful,

---

[1] The People also charged Ferrell with assault with a firearm (Pen. Code, § 245, subd. (a)(2)) based on him, two weeks before he killed Rawlings, shooting another victim in the groin after a fight that started over a possibly stolen bicycle. Ferrell was convicted of this charge, but does not challenge that conviction here.

deliberate, and premeditated killing"]) and involuntary manslaughter (*id.*, § 192 ["Manslaughter is the unlawful killing of a human being without malice"]), providing versions of CALJIC Nos. 8.10, 8.11, 8.20, 8.30, 8.31, 8.32, and 8.45. The court also explained the doctrine of transferred intent, whereby one who "attempts to kill a certain person, but by mistake or inadvertence kills a different person" is guilty as if "the person originally intended to be killed, had been killed."

The jury acquitted Ferrell of first degree premeditated murder but found him guilty of second degree murder. Jurors did not specify which theory or theories of second degree murder supported their verdict. They did, however, find that Ferrell, in killing Rawlings, had "personally and intentionally discharged a firearm, to wit, a handgun, which proximately caused great bodily injury and death to the victim within the meaning of [the] Penal Code Section 12022.53(d)" sentencing enhancement. The trial court imposed a sentence of 40 years to life for the murder of Rawlings and the true finding on the enhancement.

The Court of Appeal affirmed Ferrell's second degree murder conviction. (*People v. Ferrell* (Sep. 27, 2004, B168679) [nonpub. opn.].) It rejected his argument that the trial court erroneously instructed jurors on a felony-murder theory. It invoked the then-current rule of *People v. Robertson* (2004) 34 Cal.4th 156, that an assaultive felony, such as willful discharge of a firearm under section 246.3, could support a felony-murder conviction so long as the felonious act had a purpose "collateral" to the killing. Because Ferrell's "jury could reasonably conclude" he fired his gun "intentionally as a warning . . . the felony-murder instruction was proper." We denied review. (*People v. Ferrell, supra*, review den. Dec. 22, 2004, S129037.)

## C.    Ferrell's Petitions for Habeas Corpus

Five years after Ferrell's direct appeal, we overruled *Robertson* and concluded assaultive felonies, "such as a violation of section 246 or 246.3, . . . cannot be the basis of a felony-murder instruction." (*Chun*, *supra*, 45 Cal.4th at p. 1200; see also *id.* at pp. 1200–1201.)

Ferrell, relying on *Chun*, has sought a writ of habeas corpus.    He asserts that his jury received felony-murder instructions predicated on a section 246.3 violation, that these instructions allowed the jury to convict on an invalid theory of second degree murder, and that, therefore, his murder conviction cannot stand.  Ferrell first filed a petition for habeas corpus in the trial court, which was summarily denied, and a petition in the Court of Appeal, which was denied on its merits. (*In re Ferrell* (Oct. 22, 2020, No. B303028) [nonpub. opn.].) Ferrell then filed a petition for habeas corpus in this court.  We ordered the Secretary to show cause why relief should not be granted and now address the merits of Ferrell's claim.

## II.    DISCUSSION

## A.    Jurors at Ferrell's Trial Received Instructions on an Invalid Second Degree Felony-murder Theory.

Second degree murder is an unlawful killing with malice aforethought, but without the premeditation or deliberation required for first degree murder.  (*People v. Knoller* (2007) 41 Cal.4th 139, 151.)  Malice may be express or implied.  (*Ibid.*) Malice is express when a defendant intends to kill and implied when a defendant consciously disregards danger to human life. (*Id.* at pp. 151, 156–157.)  Implied malice requires proof of both a physical act and a mental state.  Physically, a defendant must

perform an act whose natural consequences are dangerous to life, or put another way, defendant must perform "an act that involves a high degree of probability" of death. (*Id.* at p. 156; see also *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 111.) To establish the mental state required for implied malice, the defendant must deliberately perform the act with a conscious disregard for life, knowing the act endangers another's life. (*Knoller*, at p. 143 [malice is implied when the act dangerous to life " ' "was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' "]; *Chun, supra,* 45 Cal.4th at p. 1181; *Nieto Benitez,* at p. 104 [explaining the evolution of the phrasing of the implied malice components].)

Under the second degree felony-murder rule, as our cases have described it, commission of a felony " 'inherently dangerous to human life' " can substitute for malice. (*Chun*, *supra*, 45 Cal.4th at p. 1182.) This rule curtails the malice inquiry, obviating the need for the jury to "further examin[e] the defendant's mental state." (*Ibid.*; see *People v. Patterson* (1989) 49 Cal.3d 615, 626 ["The felony-murder rule generally acts as a substitute for the *mental state* ordinarily required for the offense of murder"]; *People v. Satchell* (1971) 6 Cal.3d 28, 43 [describing the rule as a "short-circuit"]; *People v. Ireland* (1969) 70 Cal.2d 522, 538 ["[A] second degree felony-murder instruction" relieves " 'the jury of the necessity of finding one of the elements of the crime of murder' [citation], to wit, malice aforethought"].)

Pursuant to the second degree felony-murder rule, Ferrell's jury was instructed to convict him of second degree murder if Ferrell intentionally committed the felony of willfully discharging a firearm in a grossly negligent manner and, during that offense, Rawlings was unlawfully killed, whether

intentionally, unintentionally, or accidentally. The Legislature enacted section 246.3's prohibition on grossly negligent firearm discharges specifically to dissuade celebratory, skyward gunshots in an urban setting. (See *People v. Ramirez* (2009) 45 Cal.4th 980, 987–988; *People v. Thomas* (2011) 52 Cal.4th 336, 363.)

After Ferrell's conviction became final, we revisited the scope of the second degree felony-murder rule. We held in *Chun* that when the underlying felony is assaultive, such as the willful discharge felony in section 246.3, that felony always "merges with the homicide" and cannot support a felony-murder conviction. (*Chun, supra,* 45 Cal.4th at p. 1200.) We overruled cases taking a contrary approach to merger, including those that had allowed felony-murder prosecutions if assaultive felonies were committed with a purpose collateral to the killing. (*Id.* at pp. 1199–1201.) Applying the felony-murder rule to any assault, we said, would stretch the rule "beyond its required application." (*Id.* at p. 1200.) It would impute malice aforethought to every assault, merging every assault resulting in death — a great majority of all killings — into murder. (*Id.* at p. 1189.) Such " 'bootstrapping finds support neither in logic nor in law.' " (*Ibid.*) More recently, our Legislature has gone farther than *Chun,* saying without varnish that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (Senate Bill No. 1437 (2017–2018 Reg. Sess.) § 2; Pen. Code, § 188, subd. (a)(3).)

**B.    Alternative-Theory Error Calls for Harmless Error Analysis.**

In light of *Chun,* which as the Secretary concedes applies retroactively in postconviction proceedings because it alters the

conduct punishable as second degree murder (see *In re Martinez* (2017) 3 Cal.5th 1216, 1222, 1224–1225), the parties agree Ferrell's jury should not have received instructions on felony murder, and Ferrell's conviction would be improper if based solely on that theory. Ferrell's jury, however, also received instructions on valid theories of second degree murder: express-malice murder and implied-malice murder without the felony-murder shortcut.

Ferrell's case, then, presents the type of "alternative-theory error" that occurs when " 'a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect.' " (*People v. Aledamat* (2019) 8 Cal.5th 1, 12 (*Aledamat*); see *id.* at p. 7, fn. 3 & p. 10; see *People v. Chiu* (2014) 59 Cal.4th 155, 167, superseded by statute on another ground, as noted in *People v. Gentile* (2020) 10 Cal.5th 830, 849.) We acknowledged in *Aledamat* that when a theory of guilt is factually incorrect, meaning the facts put in evidence do not support it, jurors are equipped to detect the shortcoming in proof and reject the unsupported theory. (*Aledamat*, at p. 7.) When a theory of guilt is legally incorrect, however, we confront an incorrect statement of law. Jurors are not equipped to detect and account for such errors; instead, jurors are told to take the law only from the court's instructions. (*Id.* at pp. 7–8.) When, as here, an alternative theory is legally incorrect, instructions on that theory violate a defendant's constitutional right to "a jury properly instructed in the relevant law." (*In re Martinez*, *supra*, 3 Cal.5th at p. 1224.) We evaluate the prejudice of such errors under the heightened standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), the same standard of prejudice applicable to other instructional errors that misdescribe criminal offenses. (*Aledamat*, at pp. 7–13.)

Under *Chapman*'s familiar standard, we reverse a conviction "unless, after examining the entire cause, including the evidence, and considering all relevant circumstances," the reviewing court "determines the error was harmless beyond a reasonable doubt." (*Aledamat, supra*, 8 Cal.5th at p. 13.) In the context of alternative-theory errors, this means we reverse " 'unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict.' " (*Id.* at p. 10, quoting *Chun, supra*, 45 Cal.4th at p. 1201.)

Harmlessness can be shown " 'if the jury verdict on other points effectively embraces' " the valid theory, " 'or if it is impossible, upon the evidence, to have found what the verdict *did* find without finding' " the facts underlying the valid theory as well. (*Chun, supra*, 45 Cal.4th at p. 1204; see *Aledamat, supra*, 8 Cal.5th at pp. 10, 15.) "In determining this impossibility or, more generally, whether the error was harmless, the reviewing court is not limited to a review of the verdict itself." (*Aledamat*, at p. 13.) "[I]f ' "[n]o reasonable jury" ' would have found in favor of the defendant on the" valid theory, "given the jury's actual verdict and the state of the evidence, the error may be found harmless beyond a reasonable doubt." (*In re Lopez* (April 3, 2023, S258912) __ Cal.5th __ [p. 23], quoting *Aledamat*, at p. 15; accord *Neder v. United States* (1999) 527 U.S. 1, 19 ["[A] court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element"].)

We have applied these harmless error principles when reviewing alternative-theory error on both direct appeal and, as here, on habeas corpus. (*In re Martinez, supra*, 3 Cal.5th at pp. 1218, 1222–1225; accord *Hedgpeth v. Pulido* (2008) 555 U.S. 57, 61.)

**C.** **The Section 12022.53, subdivision (d) Finding, Combined with the Evidence at Trial, Does Not Render the Error Harmless.**

We now turn to whether the erroneous felony-murder instructions given to Ferrell's jury were harmless. The Secretary argues they were, because the jury's true finding on the Penal Code section 12022.53, subdivision (d) sentencing enhancement, combined with the evidence presented at trial, establishes implied malice murder.

Generally speaking, a sentencing enhancement finding is some "other point[]" or "other aspect[]" of a jury's verdict that could "effectively embrace[]" findings necessary to maintain a conviction. (*Chun, supra*, 45 Cal.4th at pp. 1204–1205; see *In re Lopez, supra*, __ Cal.5th __ [pp. 32–35] [assessing the impact of a gang-murder special circumstance]; *People v. Covarrubias* (2016) 1 Cal.5th 838, 902, fn. 26 [verdicts on other crimes and special circumstance findings conclusively established first degree felony murder].)

The enhancement here, section 12022.53, subdivision (d), increases the sentence of anyone who "in the commission of a felony specified," murder included, "personally and intentionally discharges a firearm and proximately causes . . . death." (Pen. Code, § 12022.53, subd. (d); see *id.* at subd. (a).) The trial court instructed Ferrell's jury on this enhancement using a version of CALJIC No. 17.19.5, telling jurors if they found him guilty of murder, they had to "determine whether the defendant intentionally and personally discharged a firearm and proximately caused death to a person in the commission of that felony." The court's instructions described the intent required as the intent to discharge a firearm. And the court's instructions

defined an act proximately causing death as one that "sets in motion a chain of events that produces" death "as a direct, natural and probable consequence of the act," "without which the death would not have occurred." (See *People v. Bland* (2002) 28 Cal.4th 313, 333–338 [discussing proximate cause].)

As the Secretary acknowledges, findings under section 12022.53, subdivision (d), do not, on their own, encompass the definition of implied malice murder. (See *People v. Offley* (2020) 48 Cal.App.5th 588, 598.) Recall that implied-malice murder has a physical component: an act whose natural consequences are dangerous to life. And it has a mental component: defendant's deliberate performance of the act with conscious disregard for life, knowing the act endangers another's life. (*Chun, supra*, 45 Cal.4th at p. 1181.) The mental component calls for a subjective inquiry into a defendant's state of mind and requires "a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*People v. Watson* (1981) 30 Cal.3d 290, 296–297.) The mental component may be absent even if defendant's intentional acts are inherently dangerous in the abstract or would appear risky to a reasonable person. (*Ibid.*; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1210; *People v. Nieto Benitez, supra*, 4 Cal.4th at p. 107.)

Section 12022.53, subdivision (d), requires only an intent to discharge a firearm, not subjective awareness of a risk or disregard for life. (See *People v. Offley, supra*, 48 Cal.App.5th at p. 598; *People v. Lucero* (2016) 246 Cal.App.4th 750, 759–760; see generally *In re Tameka C.* (2000) 22 Cal.4th 190, 199 ["[W]hen the Legislature intends to require proof of a specific intent in connection with a sentence enhancement provision, it has done so explicitly."].) Thus, a finding under this section is no proxy for the mental component of implied malice murder.

The Secretary contends that even if the jury's findings under section 12022.53, subdivision (d), are not themselves "dispositive" of whether Ferrell harbored malice, the jury's findings are nonetheless "informative" on the issue. The jury's finding, says the Secretary, of an intentional gunshot proximately causing death during commission of murder, when considered with the evidence presented at trial, establish that Ferrell not only intentionally shot a firearm, but must have intentionally shot towards people, which the Secretary equates with malice. We disagree.

The evidence of how Ferrell shot Rawlings as well as Ferrell's mental state in doing so was in conflict. Given the standard of review for alternative-theory error, we do not view the evidence supporting the valid theory in the light most favorable to the prosecution, but instead consider whether a reasonable jury, given the findings actually made and the state of the evidence, could have found in favor of the defendant. (*In re Lopez, supra*, __ Cal.5th __ [pp. 23, 39, fn. 8, 41–42]; *Aledamat, supra*, 8 Cal.5th at pp. 10, 15.) To be sure, prosecution witnesses testified that Ferrell shot Rawlings after the fight was over and that Ferrell only shot towards Rawlings and the gang members, not skyward. Ferrell, however, and his fellow gang member, Keith, both asserted the fighting was ongoing when Ferrell shot. In Ferrell's statement to police, which the jury considered as evidence, Ferrell stated he only intentionally fired once into the sky to stop the fighting and the gun "went off" a second time; he kept the gun barrel pointing skyward "the whole time," including as he lowered his arm; he never pointed the gun at anybody; and he shot his friend accidentally. Keith's testimony corroborated Ferrell's statement to police in that Keith agreed Ferrell's first shot was "straight

up in the air." In addition, one of the prosecution witnesses testified that Ferrell had trouble controlling the gun. This witness and Keith both agreed that Ferrell expressed surprise after the killing, saying he "didn't mean it." Indeed, the prosecution never suggested a motive for Ferrell to kill his childhood friend and fellow gang member and, furthermore, conceded, in argument, the rivalry between the gang subsets "wasn't strong," suggesting there was similarly no clear motive for Ferrell to have aimed at members of the other subset.

Looking at this conflicting evidence, jurors could have, consistent with the intentional discharge finding, reasonably rejected the factual premise — a gunshot intentionally fired at people — that the Secretary equates with malice. Even if jurors ultimately rejected the youthful Ferrell's story that the second discharge simply "went off" by accident, jurors could have concluded Ferrell intentionally discharged his weapon but credited Ferrell's subjective belief he was pointing the gun to "the air" the "whole time," never at people, and the shooting was accidental in this way.[2] Although Ferrell's jurors were instructed, per CALJIC No. 2.21.2, that they could reject a witness's testimony in its entirety if a witness was "willfully false in a one material part," the instruction did not so require. Jurors remained free to pick and choose those portions of evidence they found credible, " 'weaving a cloth of truth' " from available materials. (*Stevens v. Parke, Davis & Co.* (1973) 9

---

[2] The Court of Appeal, when affirming Ferrell's conviction, adopted this view. It concluded instructions on felony murder had been proper given the evidence at trial, because "although Ferrell claimed the shot that killed Rawlings was fired accidentally, the jury could reasonably conclude it was fired intentionally as a warning."

Cal.3d 51, 68; *People v. Riel* (2000) 22 Cal.4th 1153, 1182 [noting jurors may believe truth lies "between" the differing testimony of witnesses]; *Estate of Gilliland* (1971) 5 Cal.3d 56, 60 [the "trier of fact was not required to make a selection between the respective testimony of the witnesses on one side or the other in its entirety"]; *People v. Robinson* (1964) 61 Cal.2d 373, 389 [jurors may "accept one portion of a witness's testimony while rejecting another"].)

Assuming the jury took the view that Ferrell intentionally discharged the fatal shot believing he was aiming skyward, the jury could have readily found Ferrell guilty under the second degree felony-murder theory *Chun* invalidated, premised on him violating section 246.3.[3] Under this view, a second degree felony-murder conviction would also harmonize with the jury's section 12022.53, subdivision (d) finding, because Ferrell would have, in the commission of that crime, intentionally discharged a firearm and proximately caused death.[4] In addition, a second

---

[3] The parties do not dispute that if Ferrell intentionally discharged a warning shot amidst a gang fist fight it could violate Penal Code section 246.3. The parties' closing arguments and jury instructions allowed this possibility. We do not address the question further.

[4] Ferrell, pressing the theory that the fatal shot was instead an accidental discharge that more plainly lacked malice because it simply "went off," argues jurors could have, consistent with this theory and as instructed, found the section 12022.53, subdivision (d) enhancement true by finding Ferrell's first, intentional discharge caused the second, fatal shot, and, in this way, proximately caused Rawlings' death. Ferrell also argues jurors could have found the enhancement true if they found he fired the first, intentional shot and then, without any relationship to that first shot, proximately caused death by

degree felony-murder theory would comfortably fit between, on the one hand, the jury's rejection of first degree murder — a murder with intent to kill and deliberation or premeditation — and the jury's rejection of an accidental shooting without malice warranting either an involuntary manslaughter conviction or an outright acquittal.

At the same time, the jury would have avoided the requirement to consider malice, and its verdict, standing alone, would not have "effectively embrace[d]" that concept. (*Chun*, *supra*, 45 Cal.4th at p. 1204.) Moreover, because a rational jury, consistent with a finding under section 12022.53, subdivision (d), could find Ferrell intended to shoot only skyward, it would not have been "impossible, upon the evidence," for such a jury to reject implied malice and a second degree murder verdict based on that theory. (*Ibid.*; *People v. Merritt* (2017) 2 Cal.5th 819, 827, 832; accord *Neder v. United States*, *supra*, 527 U.S. at pp. 19–20.) Putting aside the question of whether a skyward shooting carries a "high probability of death" and thus satisfies the physical component of implied malice (*People v. Knoller*, *supra*, 41 Cal.4th at p. 156), such a jury could have found Ferrell

---

accidentally discharging the second. According to Ferrell, when jurors were instructed to find the enhancement true if "defendant intentionally and personally discharged a firearm and proximately caused death to a person in the commission of that felony," they were not asked to decide, and so did not decide, whether an intentional discharge *itself* directly caused death. We do not address what precise causal link the jury instructions here required, the instructions' adequacy, or the plausibility of a first, intentional warning shot proximately causing an accidental but fatal discharge. As we explain in the main text, a jury could have concluded Ferrell lacked the mental state necessary for implied malice murder even if the fatal shot was deemed intentional.

to be lacking the mental component of implied malice — a conscious disregard for life, knowing one's act endangers another's life (see *id.* at p. 143).

We have held that when evidence allows the conclusion that a defendant "shot to frighten . . . but had no intention of killing or injuring anyone and did not aim at them, the jury could have found defendant guilty of involuntary manslaughter" — a killing without malice — and instructions on that theory had to be given upon prosecution for murder. (*People v. Carmen* (1951) 36 Cal.2d 768, 772, 774; see *People v. McGee* (1947) 31 Cal.2d 229, 238 [discharging a pistol with intent to frighten could be involuntary manslaughter]; cf. *People v. Pshemensky* (1966) 244 Cal.App.2d 154, 155–156 [involuntary manslaughter conviction affirmed when defendant shot a rifle "in the heavily populated Hollywood area" but intending to shoot birds in an avocado tree]; *People v. Nuno* (1928) 89 Cal.App. 1 [affirming grant of new trial after manslaughter conviction where evidence showed defendant only intended to shoot gun into ground to scare boys stealing fruit from his orchard and never aimed at them or pointed his gun in their direction].) In *Chun*, by contrast, we concluded that because a jury found defendant had the "specific intent" to "shoot[] at an occupied vehicle," and did so at close range in violation of Penal Code section 246, the jury would have necessarily found defendant had the mental state, in addition to having performed the physical act, required for implied malice murder. (*Chun*, *supra*, 45 Cal.4th at p. 1205, italics omitted.)

Here, unlike in *Chun*, it is not clear Ferrell was ever aiming at a specific target and may have only believed, as he claimed, that he was shooting skyward. We acknowledge shooting into the air has its dangers, which the Legislature

17

recognized in adopting Penal Code section 246.3.[5] (See *People v. Ramirez, supra*, 45 Cal.4th at pp. 987–988.) But it is the jury's province, in a homicide case, to assess that danger, probe defendant's state of mind, and determine whether or not a defendant killed with implied malice. Whether jurors might have, if directly asked, found Ferrell harbored implied malice is, as we have noted, a separate question, and it is not the one before us. (See *People v. Mil* (2012) 53 Cal.4th 400, 417–419 [distinguishing between substantial evidence of a mental state and evidence of a mental state so convincing that no rational factfinder would reject it].) If we look at the evidence, the question for us — in walking the "tightrope" of this aspect of harmless error review where we must avoid "displacing the jury as finder of fact" on contested issues (*Aledamat, supra*, 8 Cal.5th at p. 17 (conc. & dis. opn. of Cuéllar, J.); see *Neder v. United States, supra*, 527 U.S. at pp. 17–19) — is whether it was "impossible, upon the evidence, to have found what the verdict did find," namely an intentional discharge, without also finding implied malice (*Chun, supra*, 45 Cal.4th at p. 1204). It was not. Because a rational factfinder, consistent with a finding under section 12022.53, subdivision (d), could have rejected malice and

---

[5] Assuming Ferrell's jury found he committed the willful discharge felony necessary for a felony murder verdict, the Secretary has not argued that such a finding would equate with malice, but instead acknowledges the willful discharge felony requires the lesser mental state of gross negligence. (See Pen. Code, § 246.3, subd. (a) ["any person who willfully discharges a firearm in a grossly negligent manner"]; *People v. Watson, supra*, 30 Cal.3d at p. 296 ["Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence."].)

rendered a different verdict but for the erroneous felony murder instructions, Ferrell's second degree murder conviction cannot be affirmed by looking to the evidence. (*In re Lopez, supra,* __ Cal.5th __ [p. 23].)

Ultimately, the Secretary has not demonstrated the harmlessness of instructing Ferrell's jury with a now-invalid theory of felony murder. Neither the section 12022.53, subdivision (d) finding nor the evidence cure this error. Ferrell, therefore, is entitled to reversal of his second degree murder conviction.

## III. DISPOSITION

Ferrell has established entitlement to habeas corpus relief on his claim that his jury received instruction on an invalid theory of second degree murder. We therefore grant relief and vacate the judgment against Ferrell in Los Angeles County Superior Court Case No. BA212763 insofar as it rests on Ferrell's conviction for second degree murder. Upon finality of our opinion, the Clerk of the Supreme Court is to remit a certified copy of the opinion to the Los Angeles County Superior Court for filing, and respondent is to serve a copy of the opinion on the prosecuting attorney. (See Pen. Code, § 1382, subd. (a)(2).)

**JENKINS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  In re Ferrell

---

**<u>Procedural Posture</u>** (see XX below)
**Original Appeal**
**Original Proceeding** XX
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S265798
**Date Filed:** April 6, 2023

---

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Marsha N. Revel

---

**Counsel:**

Clifford Gardner, under appointment by the Supreme Court, for Petitioner Tyree Ferrell.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Louis W. Karlin, David W. Williams, and Lindsay Boyd, Deputy Attorneys General, for Respondent Department of Corrections and Rehabilitation.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Clifford Gardner
Attorney at Law
1448 San Pablo Avenue
Berkeley, CA 94702
(510) 524-1093

Lindsay Boyd
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-2000