Filed 6/16/20
On transfer (B264402)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re | B264402 |
| JUAN MARSHALL RAYFORD | (Los Angeles County Super. Ct. No. MA028053) |
| on Habeas Corpus. | |
| In re | B303007 |
| DUPREE ANTOINE GLASS | |
| on Habeas Corpus. | |

ORIGINAL PROCEEDINGS; petitions for a writ of habeas corpus. Robert J. Perry, Judge. Petitions granted.

Law Offices of Annee Della Donna and Annee Della Donna for Petitioners.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez and Noah P. Hill, Deputy Attorneys General, for Respondent.

A jury convicted codefendants Juan Marshall Rayford and Dupree Antoine Glass of 11 counts of attempted willful, deliberate, and premeditated murder and one count of shooting at an inhabited dwelling based on their participation in a 2004 shooting at the home of Sheila Lair. On direct appeal, we affirmed Rayford's and Glass's convictions but vacated the gang and firearm enhancements. (*People v. Rayford* (July 18, 2006, B179017) [nonpub. opn.] (*Rayford I*).)

On May 29, 2015 Rayford filed a petition for writ of habeas corpus, in part arguing the jury was improperly instructed on the "kill zone" theory of concurrent specific intent to prove the 11 counts of attempted murder. After we denied the petition, the California Supreme Court granted review but deferred action pending consideration of the kill zone theory in *People v. Canizales* (2019) 7 Cal.5th 591, 597 (*Canizales*). (*In re Rayford* (Nov. 24, 2015, S229536).) The Supreme Court likewise deferred action on Glass's March 9, 2017 petition for writ of habeas corpus. (*In re Glass* (Sept. 18, 2019, S240520).)

On June 24, 2019 the Supreme Court held in *Canizales* that "a jury may convict a defendant under the kill zone theory only when the jury finds that: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Canizales, supra*, 7 Cal.5th at pp. 596-597.)

On September 18, 2019 the Supreme Court transferred Rayford's case to this court with directions to vacate our prior order denying the petition for writ of habeas corpus and "to reconsider the petition in light of [*Canizales*]." (*In re Rayford, supra*, S229536.) Also on September 18, 2019 the Supreme Court denied Glass's petition for writ of habeas corpus "without prejudice to filing the petition in the Court of Appeal, Second Appellate District, for consideration of our opinion in [*Canizales*]." (*In re Glass, supra*, S240520.) Glass filed a petition for writ of habeas corpus in this court on December 13, 2019. On December 18, 2019 we issued an order to show cause why relief should not be granted.

We conclude *Canizales* applies retroactively to Rayford's and Glass's convictions. Further, this is not one of the "relatively few cases in which the [kill zone] theory will be applicable and an instruction appropriate." (*Canizales, supra*, 7 Cal.5th at p. 608.) It was prejudicial error for the trial court to instruct the jury on the kill zone theory, and we now grant the petitions.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Information*

In 2004 an information charged Rayford and Glass with 11 counts of attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 187, subd. (a), 664)[1] and one count of shooting at an inhabited dwelling (§ 246). Each attempted murder count named a single victim: Kimberly Lair (count 1), Sheila Lair

---

[1]     All further statutory references are to the Penal Code.

(count 2), Darrel Edward[2] (count 3), Donisha Williams (count 4), Jasmin Thompson (count 5), Shadonna Williams (count 6), Terry Watson (count 7), Ebony Howard (count 8), Jerterry Burns (count 9), Donte Burns (count 10), and Jermaine Cooper (count 11).[3] As to all counts, the information alleged Rayford and Glass committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)), a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)), and a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)).[4]

B.    *The Evidence at Trial*[5]
    1.    *The People's case*
    On the night of January 2, 2004, 18-year-old Rayford and 17-year-old Glass were at a party. There they saw 15-year-old Donisha with her adult sister Shadonna and 17-year-old cousin Perry. Donisha, Shadonna, and their sister Shontel Williams lived with their mother, Sheila. Glass had known Donisha and

---

[2]    Although the information refers to Darrel as "Darrell," we use the spelling from the trial testimony.

[3]    We refer to the alleged victims by their first names to avoid confusion because some share a last name.

[4]    Although the information does not allege the gang and firearm enhancements as to count 11 (Jermaine), the jury found the allegations true as to all counts. The record does not reflect whether the information was amended before trial.

[5]    We take the discussion of the evidence at trial principally from *Rayford I, supra*, B179017, with additional facts from the trial record filed as exhibits to the petitions filed by Rayford and Glass.

4

her family for several years and had eaten many meals at the family's house in the past year. Sheila described Glass as "a part of our family." Glass's sister went to school with one of Sheila's daughters; Rayford went to school with another. Rayford and Glass sometimes visited Sheila's house together. Glass and Perry were also friends.

During the party Glass and Perry began to argue. Glass gathered some people, including Rayford, to confront Perry outside. Donisha, Shadonna, and Perry got in a car to leave. Someone tried to reach into the car and grab Perry. Rayford was yelling. Shadonna drove away. Shadonna and Donisha dropped Perry off at their grandmother's house and returned to their own house sometime after 1:00 in the morning.

Shortly thereafter Glass called Donisha on her mobile phone walkie-talkie. Glass and Donisha frequently communicated in this manner. Glass asked where Perry was, explaining he wanted to fight him. Donisha told Glass that Perry was at her grandmother's house. Glass repeated his question several times, and Donisha felt Glass thought she was lying. Donisha invited Glass to her house to see for himself Perry was not there.

Ten minutes later, at around 1:30 a.m., Glass called Donisha and told her he was at her house. Donisha and Shadonna exited their house as Glass's car and two other cars pulled up. Glass, Rayford, and many other young men exited the cars. Glass directed Donisha to tell Perry "to come outside and catch a fade," meaning to fight Glass. But Perry was not in the house. Donisha and Shadonna went back inside to wake up their mother. Also in the house were Shontel; Sheila's sister Kimberly; Kimberly's boyfriend; and Sheila's nieces and nephews Ebony,

Jasmin, Jermaine, Jeterry,[6] Kevante, and Donte; as well as Sheila's two neighbors, Terry and Darrel.[7] The family members and neighbors ranged in age from six to 21 years old.

Sheila exited the front door, and "[m]ore than a few" of the people in the house followed her outside, including Donisha, Terry, and Darrel. As she walked outside, Sheila saw a large group of young men standing in the street and on her lawn.[8] Sheila's house was on a corner lot and had a south-facing front door. She stood in "the middle of the grass" in her front yard. Sheila recognized Glass, Rayford, and "Fat Man" standing on the grass. Fat Man stood to her left (on the east side of the house), while Glass stood in front of her, and Rayford stood to her right (to the west) at the edge of the yard near a tree.

Glass told Sheila "to send [Perry] outside." Sheila told him Perry was not there and there would be no fight. As Glass approached Sheila, Sheila told "the kids to go back in the house." While Sheila spoke with Glass, a man identified as De'Antwan and another man ran behind Sheila and struck Terry. Sheila attempted to corral her family and neighbors back inside by "walking backwards with [her] arms out pushing all the kids to go back in the house."

From an area to Sheila's left, where Fat Man was standing, gunshots were fired. Sheila heard the bullets hit the house.

---

[6]     We assume Jeterry is the same person as "Jerterry Burns" named in count 9 of the information.

[7]     Shontel and Kevante were not named as victims in the information.

[8]     Sheila estimated there were 20 to 25 young men present but also stated it "could have been" as few as 11 or 13, while Donisha estimated there were 10 or 11.

Then Glass started shooting "directly towards the house" from his position in front of Sheila. At this point Glass was standing about 33 feet from Sheila, on the grass near the sidewalk. Sheila saw a shot fired from where Glass was standing toward the first story front window. Sheila also saw a flash from where Rayford stood to Sheila's right. She did not see Rayford holding a gun but believed he fired more than one shot "up in the air," aiming above the roof of the garage. Sheila "started pushing" those gathered near the front door into the house, backing up to the concrete surface near her front door. Some of those gathered ran into the house, others dropped to the ground and tried to crawl to the house. Shots "came towards" Sheila and struck the wall near her, but they did not hit her. But Darrel was struck in the leg with a bullet.

Donisha testified Rayford fired the first shot "straight up" in the air. Glass fired into the front window. No one was standing in front of the window, but one of Donisha's cousins was looking out the window.[9] Donisha could not tell how many of the group near the front door were able to get back inside during the gunfire. Inside the house, Sheila's sister Kimberly was lying down in the second floor west bedroom when she heard five or six gunshots. As she stood, a bullet grazed her back and landed on her bed. Kimberly ran downstairs, and Sheila told her Glass had "shot up" the house. About 45 minutes after the shooting, Kimberly called Glass and asked why he had fired at their house, explaining she was injured. Glass responded, "That's what you bitches get."

---

[9]    Donisha did not identify by name the cousin in the window.

Los Angeles County Sheriff's Deputy Ed Anderson investigated the crime scene and found evidence eight bullets struck the house. Four were fired from east to west, and four were fired from south to north. The bullet that grazed Kimberly's back traveled east to west, striking "the fascia board above the front window," then traveled through the second floor east bedroom where it was "deflected" by the bedroom's bunk bed, penetrating seven walls before reaching Kimberly in the second floor west bedroom. A second bullet traveled east to west through the wooden frame of the front living room window, striking the interior ballast above the front door. A third bullet from the same direction struck the wooden molding to the east exterior wall at the main entrance. A fourth bullet travelled east to west and struck the exterior wall to the west of the front door.

A bullet travelled south to north and pierced the glass in the front living room window, striking the north dining room wall inside. A bullet from the same direction struck the exterior wall at the main entrance 30 inches above the ground and entered the house through "the right wall as you are walking in." A third south-to-north bullet traveled through the front exterior wall into the living room wall about 47 inches above the ground. A fourth struck the exterior wall just west of the main entrance about 74 inches above the ground. Although Deputy Anderson determined the gunfire originated from two general directions (east to west and south to north), he could not determine the number of shooters.[10] However, he opined the northerly fire could be consistent with two shooters firing from south to north.

---

[10] Detective Anderson also did not opine on the type of guns that were fired.

The People also presented evidence Rayford and Glass were members of criminal street gangs. But there was no evidence anyone at the scene uttered gang slogans or displayed gang signs.

2.  *The defense case*

Rayford testified he went to the party with Glass and later went to Donisha's house to watch Glass fight Perry. He did not bring a gun. When he arrived at Donisha's house, he got out of the car and stood nearby. Rayford saw Glass speak with Sheila by the front door of the house. He also saw De'Antwan and others fighting. Then he heard seven to eight gunshots, but he did not see who fired. Rayford got back in the car and ducked down. About a minute later Glass got in the car, and they drove to Rayford's house. Rayford did not see Glass with a gun. He denied he was a member of a gang.

Glass testified he had a verbal argument with Perry at the party and went to Donisha's house afterward. Glass admitted he went to the house with Rayford and others to fight Perry but denied he brought a gun. Glass was standing a foot away from the front door, fighting with neighbors Terry and Darrel, when he heard five to seven gunshots. He did not recognize the man who was shooting. Glass dropped to the ground. Glass then drove to Rayford's house, where he received a walkie-talkie call from Kimberly. She stated, "We [are] going to kill you if you don't tell us who did it." Glass denied making the statement Kimberly attributed to him. Glass also denied telling sheriff's deputies he was a member of a gang.

Glass's father, Mark Glass, testified he visited Sheila at her house shortly after the shooting. Sheila told Mark she was talking to Glass when "someone started firing a gun off in the

9

back of her." Sheila did not identify Glass as a shooter to Mark. Mark did not tell the police about this conversation with Sheila.

C.    *Jury Instructions and Closing Argument*

The trial court instructed the jury with CALJIC No. 8.66.1, that to convict a defendant of attempted murder it must find "1. A direct but ineffectual act was done by one person towards killing another human being; and  [¶]  2. The person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being."  The court instructed further, "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk.  This zone of risk is termed the 'kill zone.'  The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. [¶]  Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a 'kill zone' is an issue to be decided by you."

During his closing argument, the prosecutor explained the kill zone theory:  "What we are talking about is an idea known as concurrent intent.  And again, you mainly intend to kill one [person], but at the same time, you can be found guilty of intending to kill everyone in what's known as a kill zone, a zone of risk.  Around that person.  [¶]  And what you do is you look at the facts to determine if this is present. . . .  Where were these people?  In this case, they were gathered around the front door when the shots started.  They were crawling inside the house as the shots continued.  [¶]  The idea was whether Rayford and

10

Glass intended to ensure harm to their intended victim in a way that exposed everyone in their vicinity to harm." The prosecutor noted the bullets had traveled through the walls and entered the house, adding, "This incident involves what appears to be the majority of the living space in this house. And that is the concept I was describing when we were talking about kill zone. It's not just the front door area."

The prosecutor continued, "Perry is not a named victim in this case. It's not the prosecution's theory that Perry is even the primary victim in this case. Perry wasn't there. . . . [¶] The victims in this case are the named victims. We have three victims, primary victims. One of them [was] Sheila Lair because she was directly confronting these two gang members, and then we have the other two that I would regard as primary victims because they were struck by gunfire [Darrel and Kimberly], but the main focus of that attack at that point when the shots were fired and the triggers were pulled was Sheila Lair. Sheila Lair is your primary victim here."

D.    *The Verdict and Sentencing*

The jury convicted Rayford and Glass of 11 counts of attempted willful, deliberate, premeditated murder and one count of shooting at an inhabited building. The jury found true all the special allegations. The trial court sentenced each defendant to 11 consecutive life sentences for the attempted murders plus 220 years on the firearm enhancements (20 years on each count under § 12022.53, subds. (c) & (e)). The court stayed the sentences on the gang enhancements and on count 12 for shooting at an inhabited dwelling.

11

E.    *Defendants' Direct Appeal*

In *Rayford I*, Rayford argued there was insufficient evidence to support the attempted murder convictions under the kill zone theory because there was not sufficient evidence of a primary target or a kill zone.[11]  We concluded the evidence was sufficient, reasoning, "Simply because [*People v. Bland* (2002) 28 Cal.4th 313, 329-330] involved a single primary target does not necessarily mean the theory of concurrent intent only applies when a primary target is identified.  In this case, substantial evidence supports a finding there were several potential primary targets.  The shooters could have targeted Sheila because she disrespected Glass by telling him there would be no fighting at her house that night.  Sheila's neighbor Terry could have been the primary target given the evidence members of defendants' group started a fist fight with Terry for some unidentified reason. The jury could have drawn the inference there was preexisting ill will between Terry, on the one hand, and defendants and their associates, on the other hand.  Finally, the shooters could have targeted Sheila, Donisha and Shadonna for lying about Perry's whereabouts and trying to protect him. . . ." (*Rayford I, supra*, B179017.)

We explained further, "Based on the bullet impacts on the house, there was substantial evidence bullets were fired toward the front door of the house where victims were trying to retreat.

---

[11]    Rayford argued there was not substantial evidence to support instruction of the jury on the kill zone theory of concurrent intent; Glass argued the trial court erroneously instructed the jury on concurrent intent in a manner that allowed the jury to convict him without the specific intent to kill each of the 11 victims.

12

The evidence shows a bullet hit Darrel as he was trying to get inside (or after he already had gotten back inside). Bullets also traveled through walls, placing those inside at risk. Kimberly was standing in an upstairs bedroom when a bullet grazed her back. Despite Rayford's urging, we are not persuaded there was no kill zone based simply on the fact no one was killed or seriously injured. The manner in which the bullets were fired indicates an intent to harm everyone in the vicinity." (*Rayford I, supra*, B179017.)[12]

We affirmed Rayford's and Glass's convictions but vacated the gang enhancements, concluding there was insufficient evidence of the gangs' "primary activities" under section 186.22, subdivision (f), to support the gang allegation. Because the firearm enhancements were dependent on the gang enhancements, we vacated the firearm enhancements as well. We affirmed the judgments as modified.

F.    *Rayford's Petition for Writ of Habeas Corpus*

On May 29, 2015 Rayford filed a petition for writ of habeas corpus, in which he argued the trial court erred in instructing the jury on the kill zone theory of concurrent specific intent in light of recent case authority and he received ineffective assistance of counsel. On September 16 we denied the petition "without prejudice to refiling in this court to the extent it is determined, in

---

[12]    We also rejected Glass's contention the trial court's use of CALJIC No. 8.66.1, in conjunction with CALJIC No. 3.01 on aider and abettor liability, was erroneous because it allowed the jury to convict him of 11 counts of attempted murder without finding he had the specific intent to kill each of the victims. (*Rayford I, supra*, B179017.)

13

cases pending in the California Supreme Court, that [Rayford] may be entitled to relief." The Supreme Court granted review but deferred taking action pending consideration and disposition of the related issue in *Canizales*. (*In re Rayford, supra*, S229536.)

Following the Supreme Court's decision in *Canizales*, *supra*, 7 Cal.5th 591, on September 18, 2019 the Supreme Court transferred the matter back to this court "with directions to vacate [this court's] September 16, 2015, order denying the petition for writ of habeas corpus and to reconsider the petition in light of [*Canizales*]." Following supplemental briefing, on November 13, 2019 we issued an order to show cause why relief should not be granted. The People filed a return, and Rayford filed a traverse.

G.      *Glass's Petition for Writ of Habeas Corpus*
On March 9, 2017 Glass filed a petition for a writ of habeas corpus in the Supreme Court. On September 18, 2019, "[i]n conjunction with [the] court's decision in *Rayford on Habeas Corpus*," the Supreme Court denied Glass's petition for writ of habeas corpus "without prejudice to filing the petition in the Court of Appeal, Second Appellate District, for consideration of our opinion in [*Canizales*]." (*In re Glass, supra*, S240520.) Glass filed a petition for writ of habeas corpus with this court on December 13, 2019. On December 18 we issued an order to show cause why relief should not be granted. The People filed a return, and Glass filed a traverse.

14

## DISCUSSION

A.  *The Kill Zone Theory of Concurrent Intent To Kill*

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*Canizales, supra*, 7 Cal.5th at p. 602; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 890; *People v. Perez* (2010) 50 Cal.4th 222, 224 ["[S]hooting at a person or persons and thereby endangering their lives does not itself establish the requisite intent for the crime of attempted murder."].)  "[A]n intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Canizales*, at p. 602; accord, *People v. Bland, supra*, 28 Cal.4th at pp. 327-328 (*Bland*).)

The Supreme Court first articulated the kill zone theory of attempted murder in *Bland, supra*, 28 Cal.4th at pages 329-330, holding, "'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'"  The Supreme Court in *Bland* gave as examples of appropriate applications of the kill zone theory where an assailant places a bomb on a commercial plane intending to harm a primary target on the plane by killing all the passengers and where a defendant attacks a group of people by using "'automatic weapon fire or an explosive

15

device devastating enough to kill everyone in the group.'" (*Id.* at p. 330, quoting *Ford v. State* (1993) 330 Md. 682, 717 [625 A.2d 984, 1000-1001].) In these scenarios, "'[t]he defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.'" (*Bland*, at p. 330.)

In *Bland*, the court found that where the defendant and a second shooter fired a flurry of bullets at a fleeing car in order to kill the driver, injuring two passengers, the evidence "virtually compels" an inference the defendant created a kill zone that would support attempted murder convictions as to both passengers. (*Bland, supra*, 28 Cal.4th at pp. 330-331, 333.)

By contrast, in *People v. Perez, supra*, 50 Cal.4th at page 232, the Supreme Court concluded the defendant had not created a kill zone where he fired a single shot from a moving car at a group of eight individuals 60 feet away, therefore supporting only one, not eight, counts of attempted murder. The Supreme Court explained, "'[A] shooter may be convicted of multiple counts of attempted murder on a "kill zone" theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the "kill zone") as the means of accomplishing the killing of that victim.'" (*Ibid.*; see *People v. Stone* (2009) 46 Cal.4th 131, 135 [trial court erred by instructing on kill zone theory where defendant shot a single bullet at alleged victim standing in group of 10 rival gang members 60 feet away from defendant].)

The Supreme Court revisited the kill zone theory in *Canizales, supra*, 7 Cal.5th 591, in which it narrowed application of the doctrine. The Supreme Court held, "[T]he kill zone theory

16

for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target; and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm. [¶] In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Id.* at p. 607.)

The *Canizales* court cautioned, "[W]e anticipate there will be relatively few cases in which the theory will be applicable and an instruction appropriate. Trial courts should tread carefully when the prosecution proposes to rely on such a theory, and should provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the

17

circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm. The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Canizales, supra*, 7 Cal.5th at p. 608.)

The Supreme Court clarified that "[w]hen the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim . . . evidence of a primary target is required." (*Canizales, supra*, 7 Cal.5th at p. 608.) The *Canizales* court cited approvingly to the language in *People v. Medina* (2019) 33 Cal.App.5th 146, 155, that "'[w]ithout a primary target, there cannot be concurrent intent because there is no primary intent to kill as to which the intent to kill others could be concurrent.'" (*Canizales*, at p. 609.)

Although the defendants in *Canizales* fired five shots from a semiautomatic nine-millimeter gun at a group that included a rival gang member (Denzell Pride) with whom one of the defendants had engaged in a verbal altercation earlier that day, the defendants were not "in close proximity to the area surrounding their intended target," but instead were positioned 100 to 160 feet away from a block party on a wide city street, and the bullets were "'going everywhere'" as Pride and fellow gang member Travion Bolden ran away after the first shot was fired. (*Canizales, supra*, 7 Cal.5th at pp. 610-611.) The *Canizales* court concluded the evidence was not sufficient to allow the jury to find the defendants intended to create a zone of fatal harm around Pride, and it reversed the defendants' convictions of the attempted murder of Bolden. (*Id*. at pp. 611, 615.) The Supreme Court distinguished these facts from those in other cases in which "the defendants opened fire while in close proximity to the

18

area surrounding their intended target." (*Id*. at pp. 610-611; see *Bland, supra*, 28 Cal.4th at p. 318 [defendant fired flurry of bullets directly into vehicle]; *People v. Vang* (2001) 87 Cal.App.4th 554, 564 [defendants sprayed 50 or more bullets from high-powered, "wall-piercing" weapons at two separate apartment buildings]; *Washington v. U.S.* (D.C. 2015) 111 A.3d 16, 24 [defendant fired 10 shots at four people standing in close proximity to each other and 21 feet from defendant, hitting three of the group].)

B.     Canizales *Has Retroactive Effect*

The People contend the Supreme Court's decision in *Canizales* does not apply retroactively to final cases, such as Rayford's and Glass's. We conclude it does.

Generally, "[a] writ of habeas corpus will not issue for a claim that was raised and rejected on appeal." (*In re Martinez* (2017) 3 Cal.5th 1216, 1222 (*Martinez*); accord, *In re Reno* (2012) 55 Cal.4th 428, 476 ["legal claims that have previously been raised and rejected on direct appeal ordinarily cannot be reraised in a collateral attack by filing a petition for a writ of habeas corpus"]; *In re Waltreus* (1965) 62 Cal.2d 218, 225.) An exception to the rule applies "'when there has been a change in the law affecting the petitioner.'" (*Martinez*, at p. 1222; accord, *In re Harris* (1993) 5 Cal.4th 813, 841 ["a petitioner [may] raise in a petition for writ of habeas corpus an issue previously rejected on direct appeal when there has been a change in the law affecting the petitioner"].) "To trigger this exception, the change in the law must have retroactive effect." (*Martinez*, at p. 1222; accord, *In re Lopez* (2016) 246 Cal.App.4th 350, 357-359 (*Lopez*).) Because the federal and state courts have applied a number of tests to

19

determine whether a change in law applies retroactively, we review the historical landscape of the retroactivity jurisprudence.

1.      *The federal retroactivity tests under* Linkletter *and* Teague

Before the United States Supreme Court's decision in *Linkletter v. Walker* (1965) 381 U.S. 618, 629 (*Linkletter*), both the common law and the United States Supreme Court "'recognized a general rule of retrospective effect for the constitutional decisions of [the United States Supreme] Court . . . subject to [certain] limited exceptions.'" (*United States v. Johnson* (1982) 457 U.S. 537, 542; see *Linkletter*, at p. 622 ["At common law there was no authority for the proposition that judicial decisions made law only for the future."].)

*Linkletter* considered whether the rule announced in *Mapp v. Ohio* (1961) 367 U.S. 643, applying the exclusionary rule for evidence seized in violation of the Fourth Amendment to state court prosecutions, should operate retroactively to cases that were final prior to *Mapp*. (*Linkletter, supra*, 381 U.S. at p. 619.) *Linkletter* directed courts to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." (*Id.* at p. 629.) The *Linkletter* court weighed these factors and concluded *Mapp* did not apply retroactively on habeas corpus review, observing the purpose of *Mapp*'s application of the exclusionary rule to the states to deter illegal police action would not be served by retroactive application. (*Linkletter*, at pp. 636-637.)

For the following 20 years, the United States Supreme Court applied *Linkletter*'s test to determine the retroactivity of

20

new decisional law to final judgments of conviction. (See, e.g., *Allen v. Hardy* (1986) 478 U.S. 255, 258-260 [concluding *Batson v. Kentucky* (1986) 476 U.S. 79, which established a three-step inquiry for determining whether the prosecution's use of peremptory challenges violated the defendant's constitutional rights, did not apply retroactively to final cases]; *Stovall v. Denno* (1967) 388 U.S. 293, 297 [denying retroactivity of *United States v. Wade* (1967) 388 U.S. 218 and *Gilbert v. California* (1967) 388 U.S. 263, which held a defendant has a right to counsel during postindictment lineup for identification purposes]].)

In *Teague v. Lane* (1989) 489 U.S. 288, 302-304 (*Teague*), in a plurality decision authored by Justice O'Connor, the United States Supreme Court abandoned the *Linkletter* test for retroactivity. (*Teague*, at pp. 302-304, 310.) The *Teague* court explained as to cases on collateral review, "Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." (*Id.* at p. 310.) The court articulated two exceptions to retroactivity. First, "a new rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe . . . .'" (*Id.* at p. 311.) Second, a new rule should be applied retroactively if it is a "watershed rule[] of criminal procedure" implicating the fundamental fairness and accuracy of the proceeding. (*Id.* at pp. 311-312.)

A majority of the United States Supreme Court adopted the *Teague* rule in *Saffle v. Parks* (1990) 494 U.S. 484 and clarified *Teague*'s first exception applied to new substantive rules. (*Saffle*, at p. 494; accord, *Whorton v. Bockting* (2007) 549 U.S. 406, 416

21

["A new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a "'watershed rul[e] of criminal procedure" implicating the fundamental fairness and accuracy of the criminal proceeding.'"].)  The United States Supreme Court has since applied the *Teague* test to federal substantive and procedural rules on collateral review.  (See, e.g., *Montgomery v. Louisiana* (2016) 577 U.S. ___ [136 S.Ct. 718, 732] [concluding *Miller v. Alabama* (2012) 567 U.S. 460, which held the Eighth Amendment prohibits mandatory life sentences without parole for juvenile offenders, applies retroactively on collateral review under *Teague* because it is a substantive rule, explaining a substantive rule "forbids 'criminal punishment of certain primary conduct' or prohibits 'a certain category of punishment for a class of defendants because of their status or offense'"]; *Schriro v. Summerlin* (2004) 542 U.S. 348, 351-352 [concluding the requirement in *Ring v. Arizona* (2002) 536 U.S. 584 that aggravating factors be proved to a jury instead of a judge does not apply retroactively to final cases because it is a procedural rule that does not fall within *Teague*'s exception for a watershed rule of criminal procedure].)

Further, although *Teague* "limits the kinds of constitutional violations that will entitle an individual to relief on federal habeas, [it] does not in any way limit the authority of a state court, when reviewing its own state criminal convictions, to provide a remedy for a violation that is deemed 'nonretroactive' under *Teague*."  (*Danforth v. Minnesota* (2008) 552 U.S. 264, 282; accord, *In re Gomez* (2009) 45 Cal.4th 650, 655, fn. 3 [California courts are "'free to give greater retroactive impact to a decision than the federal courts choose to give.'"].)

2. *California retroactivity analysis under* Johnson *and* Mutch

In *In re Johnson* (1970) 3 Cal.3d 404, 410 (*Johnson*), the California Supreme Court applied a modified version of the *Linkletter* test[13] to conclude the United States Supreme Court's decision in *Leary v. United States* (1969) 395 U.S. 6 (*Leary*), which held a defendant's timely invocation of the privilege against self-incrimination constituted a complete defense to a prosecution for failure to pay a federal marijuana transfer tax, applied retroactively on collateral review. The defendant had been convicted of two counts of selling marijuana with two prior convictions, one of which was a conviction under the federal statute at issue in *Leary*. The *Johnson* court explained, "The retrospective effect of a law-making opinion is to be determined by "'(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."'" (*Johnson*, at p. 410.) After surveying United States Supreme Court decisions on retroactivity, the court reasoned, "Fully retroactive decisions are [those] vindicating a right which is essential to a reliable determination of whether an accused should suffer a penal sanction." (*Id.* at pp. 411-412.) The court added, "[T]he more directly the new rule in question serves to preclude the conviction of innocent persons, the more likely it is that the rule will be afforded retrospective application." (*Id.* at p. 413.) The *Johnson* court emphasized that under *Leary*, persons who timely assert

---

[13] The *Johnson* court adopted the modified *Linkletter* test as set forth in *Stovall v. Denno, supra*, 388 U.S. at page 297. (*Johnson, supra*, 3 Cal.3d at p. 410.)

the Fifth Amendment as a defense to the federal statute "are innocent as a matter of law." (*Johnson*, at p. 416.)

Although the California Supreme Court in *Johnson* considered whether the *Leary* court's holding grounded in federal constitutional law applied retroactively, California courts have applied *Johnson*'s tripartite test to determine the retroactivity of judicial decisions interpreting federal and California law. (See, e.g., *In re Brown* (2020) 45 Cal.App.5th 699, 715, 722 [applying *Johnson* to conclude *People v. Gallardo* (2017) 4 Cal.5th 120, which held a trial court may not make factual findings beyond those established by the conviction to increase a sentence, applied retroactively to final cases]; *In re Milton* (2019) 42 Cal.App.5th 977, 989, review granted Mar. 11, 2020, S259954 [applying *Johnson* and *Teague* to conclude *Gallardo* did not apply retroactively to final cases]; *In re Thomas* (2018) 30 Cal.App.5th 744, 753-761 [concluding *People v. Sanchez* (2016) 63 Cal.4th 665, which held an expert witness's out-of-court testimonial statements about case-specific facts violates the confrontation clause, did not apply retroactively under *Johnson*, declining to apply *Teague* as not binding on state habeas corpus review]; *In re Ruedas* (2018) 23 Cal.App.5th 777, 793-803 [concluding *Sanchez* did not apply retroactively under *Johnson* or *Teague*]; *In re Hansen* (2014) 227 Cal.App.4th 906, 919 (*Hansen*) [giving retroactive effect on habeas corpus review to new rule enunciated in *People v. Chun* (2009) 45 Cal.4th 1172 (*Chun*) that shooting at inhabited dwelling could not support second degree felony-murder conviction, because *Chun* precluded the conviction of

24

innocent persons by narrowing the class of conduct that may constitute second degree murder].)[14]

A year after deciding *Johnson*, the California Supreme Court in *People v. Mutch* (1971) 4 Cal.3d 389, 394 (*Mutch*) confronted the issue of retroactivity with respect to a change in the judicial interpretation of California statutory law. Specifically, in *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*), the California Supreme Court held movement of a victim in the course of a robbery that does not substantially increase the risk of harm above that necessary to commit the robbery does not satisfy the asportation element of aggravated kidnapping, thereby overruling its decision in *People v. Chessman* (1951) 38 Cal.2d 166. (*Daniels*, at p. 1139.)

The *Mutch* court concluded the *Daniels* decision applied retroactively to cases that were final, explaining "'a defendant is entitled to habeas corpus if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct.'" (*Mutch, supra*, 4 Cal.3d at p. 396; accord, *Woosley v. State of California* (1992) 3 Cal.4th 758, 794 (*Woosley*) [giving retroactive effect to holding that class action claims for refund of state vehicle license fees and use taxes were not authorized under state

---

[14] Most cases have applied the *Johnson* test to procedural rules, although the Court of Appeal in *Hansen* applied *Johnson* to *Chun*'s interpretation of California substantive law. (*Hansen, supra*, 227 Cal.App.4th at p. 919, fn. 3 [observing the *Johnson* test "appears tailored to procedural, and not substantive, changes in criminal law"].) The court declined to apply the retroactivity test established in *People v. Mutch* (1971) 4 Cal.3d 389, applicable to substantive changes in the law, because the parties did not brief the issue. (*Hansen*, at p. 919, fn. 3.)

law]; *In re Miller* (2017) 14 Cal.App.5th 960, 979 [California Supreme Court's decisions in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522, which limited the circumstances under which an aider and abettor to a murder under the felony-murder doctrine may be sentenced to life in prison without the possibility of parole, applied retroactively under *Mutch* because the decisions "did not create new law; they simply stated what section 190.2, subdivision (d) [defining special circumstance murder] has always meant"].)

In finding *Daniels* retroactive, the *Mutch* court observed the decision "did not overturn a judge-made rule of common law," but rather, it "recognized a statutory rule . . . to which courts had not previously given appropriate effect." (*Mutch, supra*, 4 Cal.3d at p. 394.) The California Supreme Court in *Woosley* later described the *Mutch* decision as one not involving a new rule of law because it gave effect "'to a statutory rule that the courts had theretofore misconstrued.'" (*Woosley, supra*, 3 Cal.4th at p. 794; accord, *Hansen, supra*, 227 Cal.App.4th at p. 916 [*Mutch* determined its "new interpretation of the aggravated kidnapping statute was not a change in the law at all"].) The *Woosley* court explained, "'Whenever a decision undertakes to vindicate the original meaning of an enactment, putting into effect the policy intended from its inception, retroactive application is essential to accomplish that aim.'" (*Woosley*, at p. 794.)

The *Mutch* court declined to "undertake the often perilous task of applying . . . the test of 'retroactivity' developed in a well-known series of decisions of the United States Supreme Court," citing to *Linkletter* and other United States Supreme Court decisions applying the *Linkletter* test. (*Mutch, supra*, 4 Cal.3d at pp. 394-395.) The court distinguished those cases as "primarily

concerned with such matters as the control of improper police practices," exclusion of tainted evidence, and the "reform of procedural rules affecting the reliability of the fact-finding process." (*Ibid.*)

3.      *The California Supreme Court's decision in* Martinez

Most recently, the California Supreme Court in *Martinez, supra*, 3 Cal.5th at page 1222 considered whether its decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*) applied retroactively on collateral review.  The Supreme Court in *Chiu* held the natural and probable consequences theory of aider and abettor liability cannot be relied on to convict a defendant of first degree premeditated murder.  (*Chiu*, at p. 167.)  The *Martinez* court concluded *Chiu* had retroactive effect, reasoning "a change in the criminal law will be given retroactive effect when a rule is substantive rather than procedural (i.e., it alters the range of conduct or the class of persons that the law punishes, or it modifies the elements of the offense) or when a judicial decision undertakes to vindicate the original meaning of the statute." (*Martinez*, at p. 1222.)  In so holding, the Supreme Court implicitly applied the *Teague* and *Mutch* retroactivity tests, citing with approval to the Court of Appeal's decision in *Lopez, supra*, 246 Cal.App.4th at pages 357-359, which applied *Teague* and *Mutch* to conclude *Chiu* was retroactive on habeas corpus review. (*Martinez*, at p. 1222.)[15]

---

[15]      Although the *Martinez* court indirectly referred to the *Mutch* analysis in articulating the standard for retroactivity (as when a judicial decision undertakes to vindicate the original meaning of the statute), the Supreme Court distinguished *Mutch*

27

Applying *Teague*,[16] the *Lopez* court reasoned, "The *Chiu* decision set forth a new rule of substantive law by altering the range of conduct for which a defendant may be tried and convicted of first degree murder." (*Lopez, supra*, 246 Cal.App.4th at p. 358.) The *Lopez* court alternatively found the *Chiu* decision retroactive under *Mutch*, reasoning, "By limiting the scope of aider and abettor liability in the commission of murder, the court in *Chiu* was, in effect, engaging in statutory interpretation and declaring the Legislature's intent just as the court in *Mutch* did for the aggravated kidnapping statute." (*Lopez*, at p. 359.) The *Lopez* court discussed but did not apply the tripartite *Johnson* test, describing it as the "test for determining retroactivity of judicial opinions involving questions of procedure." (*Lopez*, at p. 359, fn. 2.)

> 4. Canizales *is retroactive on habeas corpus review under federal and state retroactivity analyses*

We apply the approach taken by *Martinez* and *Lopez* and consider the retroactivity of *Canizales* under *Mutch* and *Teague*. Like *Mutch* (and *Martinez*), the holding in *Canizales* rests on an interpretation of substantive California criminal law. "In

---

on the basis the defendant there was actually innocent of kidnapping because the statute did not proscribe his conduct, whereas the defendant in *Martinez* could be retried for first degree murder consistent with *Chiu* under a different theory of aider and abettor liability. (*Martinez, supra*, 3 Cal.5th at pp. 1223-1224.)

[16] The *Lopez* court cited to *Schriro v. Summerlin, supra*, 542 U.S. at pages 351-354 for its *Teague* analysis. (*Lopez, supra*, 246 Cal.App.4th at p. 357.)

California all crimes are statutory and there are no common law crimes.  Only the Legislature and not the courts may make conduct criminal." (*In re Brown* (1973) 9 Cal.3d 612, 624; accord, *Lopez, supra*, 246 Cal.App.4th at p. 359 ["Murder, as all crimes in California, is statutory, as are the degrees of murder and the punishment."]; see § 6 ["No act or omission . . . is criminal or punishable, except as prescribed or authorized by this code . . . ."].)  As such, attempted willful, deliberate, and premeditated murder is a statutorily defined offense.  (§§ 187 [defining murder], 188 [defining malice], 664 [criminalizing attempts to commit a crime].)

Further, as in *Mutch* and *Martinez*, the *Canizales* decision "undertakes to vindicate the original meaning of the statute." (*Martinez, supra*, 3 Cal.5th at p. 1222.)  As discussed, the Supreme Court in *Bland* endorsed the kill zone theory of concurrent intent to kill to prove attempted premeditated murder.  (*Bland, supra*, 28 Cal.4th at pp. 329-330.)  But in *Canizales*, the Supreme Court limited application of the kill zone theory to correct the overbroad application of the theory by several Courts of Appeal.  (*Canizales, supra*, 7 Cal.5th at pp. 602, 607 [court "granted review in light of the conflict in the Courts of Appeal regarding the evidentiary basis for applying, and instructing on, the kill zone theory for establishing the intent to kill element of attempted murder"]; *People v. Cerda* (2020) 45 Cal.App.5th 1, 4, review granted May 13, 2020, S260915 [*Canizales* "limited the application of the kill zone theory"].)  By limiting the scope of liability for attempted premeditated murder under the theory of concurrent intent to kill, the California Supreme Court in *Canizales* was declaring the Legislature's intent, as the Supreme Court had done in *Chiu* as to aider and

abetter liability and in *Mutch* as to the aggravated kidnapping statute.  (See *Lopez, supra*, 246 Cal.App.4th at p. 359.)  And, as in *Chiu*, the *Canizales* court resolved an outstanding issue of law without expressly overturning past precedent or disapproving specific decisions of the Courts of Appeal.  (See *Chiu, supra*, 59 Cal.4th at p. 163.)  Indeed, the *Canizales* court described its holding as "consistent with *Bland*."  (*Canizales*, at p. 607.)

We reach the same conclusion under *Teague* because the rule in *Canizales* is substantive.  "A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes" or "modifies the elements of an offense."  (*Schriro v. Summerlin, supra*, 542 U.S. at pp. 353-354; accord, *Montgomery v. Louisiana, supra*, 577 U.S. at p. ___ [136 S.Ct. at p. 733].)  Similar to *Chiu*, the *Canizales* court altered the range of conduct for which a defendant may be tried and convicted of attempted premeditated murder by holding trial courts should only instruct the jury on the kill zone theory of concurrent intent where "there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm."  (*Canizales, supra*, 7 Cal.5th at p. 608; see *Lopez, supra*, 246 Cal.App.4th at p. 358; cf. *In re Milton, supra*, 42 Cal.App.5th at pp. 989, 992 [concluding the rule articulated in *People v. Gallardo, supra*, 4 Cal.5th 120 is procedural under *Teague*]; *In re Ruedas, supra*, 23 Cal.App.5th at pp. 793, 798 [concluding the rule articulated in *People v. Sanchez, supra*, 63 Cal.4th 665 is procedural under *Teague*].)

Although we focus on the *Mutch* and *Teague* retroactivity tests, we note *Johnson*'s tripartite test for retroactivity also militates strongly in favor of retroactivity because the purpose of

the rule announced in *Canizales*, of ensuring the reliability of a conviction for attempted premeditated murder, is not collateral to the guilt or innocence of a defendant (*Johnson, supra*, 3 Cal.3d at p. 415), but rather, ensures the reliability of an attempted premeditated murder conviction by requiring the defendant have acted with the specific intent to kill everyone in the kill zone. (*Canizales, supra*, 7 Cal.5th at p. 597; see *Hansen, supra*, 227 Cal.App.4th at p. 919 ["The purpose of *Chun* was to separate those actions that are punishable as second degree murder from those that are not."].)  Where the purpose of the rule strongly favors retroactivity, "this factor often is conclusive even if there is a considerable burden on the administration of justice." (*Johnson*, at p. 416.)[17]

The People also contend *Canizales* expressly made its holding prospective only by discussing its application in "future cases" and instructing trial courts to exercise caution applying the doctrine "going forward."  (*Canizales, supra*, 7 Cal.5th at

---

[17]    The People's reliance on *People v. Guerra* (1984) 37 Cal.3d 385 is misplaced.  The *Guerra* court addressed on direct appeal whether to make "an exception to 'the ordinary assumption of retrospective operation.'" (*Guerra*, at p. 401.)  The court explained where there is no prior rule to the contrary, "the new rule applies in all cases not yet final." (*Id*. at p. 399.)  This category includes cases "'resolv[ing] a conflict between lower court decisions, or address[ing] an issue not previously presented to the courts.'" (*Id*. at p. 400.)  As the *Guerra* court reasoned, in those cases "there was no clear rule on which anyone could have justifiably relied." (*Ibid*.)  The decision in *Canizales* falls squarely within the class of decisions articulating a new rule to resolve a conflict in the Courts of Appeal where there was no prior controlling rule to the contrary.

31

pp. 606, 608.) In so arguing, the People rely on *Sumner v. Workers' Comp. Appeals Bd.* (1983) 33 Cal.3d 965, *Isbell v. County of Sonoma* (1978) 21 Cal.3d 61, and *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804. But in each of those cases the Supreme Court expressly disclaimed retroactive effect of the change in law, concluding specific policy concerns weighed in favor of prospective application only. (See *Sumner*, at p. 972 ["We make this declaration prospective—from and after the date our opinion becomes final—so as to avoid unfairness to parties who have relied upon the presumed validity of the present [claims release form], and the burden upon the workers' compensation system which would result from retroactive application."]; *Isbell*, at p. 75 ["our decision should be given a limited retroactive application to permit any judgment debtor to apply for a hearing challenging the validity of the waiver in his confession of judgment"]; *Li*, at p. 829 ["[W]e hold that the present opinion shall be applicable to all cases in which trial has not begun before the date this decision becomes final in this court, but that it shall not be applicable to any case in which trial began before that date . . . ."].) *Canizales*'s guidance to trial courts stands in sharp contrast to these express statements rejecting any retroactive effect. Further, the Supreme Court's transfer of Rayford's petition to this court and denial of Glass's petition without prejudice to filing a petition in this court for consideration of the *Canizales* decision show the *Canizales* court did not intend to resolve the question of retroactivity. (*In re Rayford, supra*, S229536; *In re Glass, supra*, S240520.)

32

C. *Under* Canizales*, the Evidence at Trial Was Not Sufficient To Instruct the Jury on the Kill Zone Theory*

Rayford and Glass contend under *Canizales* the circumstances of the shooting did not support the trial court instructing the jury on the kill zone theory. Rather, they assert the only reasonable inference supported by the evidence is that the shooters fired on the house "to scare the Lair family, or send a message to Perry, or [as] a demonstration of force or to stop the fistfight," thus lacking the specific intent to kill the group assembled on the lawn and in the house. We agree.

As discussed, in determining whether "there is sufficient evidence from which the jury could find that the *only* reasonable inference is that the defendant intended to kill (not merely to endanger or harm) everyone in the zone of fatal harm," we consider the circumstances surrounding the shooting, including "the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Canizales*, *supra*, 7 Cal.5th at pp. 597, 607.) The People argue the circumstances of the shooting here support a reasonable inference the shooters intended to kill everyone in the zone of fatal harm around Sheila. As the People point out, Glass stood facing Sheila about 33 feet away, while Fat Man stood to her left and Rayford to her right. A series of eight bullets struck the house in an area surrounding Sheila and the others on the grass, who had limited means of escape as they funneled into the entrance of the house. One bullet struck Darrel. The gunfire that traveled from east to west was powerful enough to pierce multiple walls within the house. These facts supported our decision in *Rayford I*.

33

However, other circumstances support a reasonable alternative inference more favorable to Rayford and Glass, that the shooters acted not with the specific intent to kill everyone in and in front of the house, but with conscious disregard of the risk Sheila and her family and neighbors might be seriously injured or killed. Each shooter shot at most four bullets at the house—four from east to west (from where Fat Man was standing) and four from south to north (from where Glass was standing). Glass was standing in front of Sheila, but he shot "directly towards the house," not at her. He also fired at the front window where no one was standing, but a cousin was looking out. Rayford only shot into the air. Neither Sheila nor Donisha testified any shooter targeted specific victims. The eight bullets that were recovered were not fired at a specific location, instead striking the house from the window to the right of the front door to the wood to the left of the door. Although the weapons had sufficient force to pierce the walls of the house, there was no evidence the guns were rapid-firing semiautomatic or automatic weapons.

These circumstances are markedly different from those in *People v. Cerda, supra*, 45 Cal.App.5th at pages 16-17, in which the Court of Appeal subsequent to *Canizales* upheld a kill zone instruction. There, the shooter fired on two houses using an AK-47 assault rifle to fire "up to four times the velocity of handgun ammunition" into the houses, including firing at least 16 shots at one house and multiple shots at second house. (*Cerda*, at p. 7; see *People v. Vang, supra*, 87 Cal.App.4th 554, 558, 564 [evidence shooters used "an AK series assault rifle" and shotgun to fire 50 shots at front of duplex with most of bullets directed at primary target's unit created reasonable inference defendants intended to kill everyone inside]; cf. *People v. Thompkins* (2020)

34

48 Cal.App.5th 676, 688-689, 705-706 [trial court erred in giving kill zone instruction where shooter fired 10 shots into crowd of 10-20 customers in restaurant, killing two and wounding five people, but there was no intended target]; *People v. Mariscal* (2020) 47 Cal.App.5th 129, 139 [trial court erred in giving kill zone instruction where defendant killed intended target, then shot at four of target's friends, but error was harmless beyond a reasonable doubt].)[18]

Although egress from the fray here was more constricted than the open street in *Canizales*, the house's front yard and door provided maneuvering space for those congregated to avoid fatal injury, and for all but Darrel and Kimberly to avoid physical injury of any kind. (Cf. *Bland, supra*, 28 Cal.4th at p. 331 [kill zone instruction supported where "defendant and his cohort fired a flurry of bullets at [primary target's] fleeing car," creating a kill zone around the car's other passengers].) While the determination whether to instruct on the kill zone "does not turn on the effectiveness or ineffectiveness of the defendant's chosen method of attack," whether an inference can reasonably be drawn "is at least informed by evidence" the potential primary targets— Sheila, Donisha, and Terry (like Pride and Bolden in *Canizales*) were not hit by any of the bullets. (*Canizales, supra*, 7 Cal.5th at p. 611.) Although a bullet struck Darrel, trial testimony did not reveal where Darrel was standing when he was struck. Like Kimberly in the upstairs bedroom, the evidence is equivocal whether Darrel came within a zone of fatal harm or was simply

---

[18] The Supreme Court in *Canizales* cited the holding in *People v. Vang* approvingly. (*Canizales, supra*, 7 Cal.5th at p. 610.)

hit by a bullet fired into the house with conscious disregard of the risk of seriously injuring or killing those inside or on the grass.

We also consider the context of the incident. After Glass argued with Perry, he and Rayford went to Sheila's house looking to fight him. When Sheila told Glass that Perry was not home, De'Antwan accosted Terry, and the shooting began. Yet prior to the incident, Glass was "like a part of [Sheila's] family," and Glass and Rayford sometimes visited Sheila's house together. In light of these facts, coupled with the method of force employed (four to five bullets fired by each shooter randomly at the front of the house), there is not sufficient evidence from which the jury could find the *only* reasonable inference is that the shooters intended to kill everyone in a zone of fatal harm. (*Canizales*, *supra*, 7 Cal.5th at pp. 597, 607.) Rather, a reasonable alternative inference is that the shooters fired on the house to provoke Perry, whom they believed was inside, or to punish Sheila and her family for protecting Perry, with conscious disregard of the risk Sheila and the others inside and in front of the house would be seriously injured or killed. Glass's statement to Kimberly after the shooting, "That's what you bitches get," is as consistent with a specific intent to kill as with an intent to punish Sheila and her family for hiding Perry, with conscious disregard of the risk of fatal harm or serious injury to Sheila and her family and neighbors. Under these circumstances the trial court erred in instructing the jury on the kill zone theory. (*Id.* at p. 608.)

D. *The Error Was Prejudicial*

As discussed, the trial court instructed the jury on two theories of liability—that the defendants intended to kill each

36

victim as a primary target, and they intended to kill each victim as a person in the kill zone.  The People contend even if the evidence was not sufficient to support the trial court's instruction on the kill zone theory, any error was harmless because the kill zone instruction was not misleading, and even if the theory did not apply, the jury was also properly instructed on a correct legal theory requiring intent to kill the primary target.  We agree with Rayford and Glass the trial court instructed the jury on a legally inadequate theory of the kill zone, and we therefore consider whether the error in instructing the jury was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).  It was not.

The California Supreme Court in *Canizales* distinguished between an instruction on an alternative theory that is "not factually supported by the evidence adduced at trial," and one that is ""'contrary to law," or, phrased slightly differently, cases involving a "*legally* inadequate theory" . . . .'" (*Canizales, supra*, 7 Cal.5th at p. 613, quoting *People v. Guiton* (1993) 4 Cal.4th 1116, 1128.)  The *Canizales* court found the instruction given to the jury on the kill zone was legally inadequate because it provided "no adequate definition to enable the jury to determine whether the theory was properly applicable." (*Canizales*, at p. 615.)  The Supreme Court left for another day whether instruction of the jury on a legally inadequate theory is subject to harmless error review under *Chapman*, or whether "an even more stringent test" applies. (*Canizales*, at p. 615.)  The Supreme Court in *People v. Aledamat* (2019) 8 Cal.5th 1, 13, has now resolved that question, holding "alternative-theory error is subject to the more general *Chapman* harmless error test.  The reviewing court must reverse the conviction unless, after

37

examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." In contrast, factually erroneous theories do not require reversal unless the record affirmatively indicates the verdict actually rests on the inadequate ground. (*Id.* at p. 7; *Guiton*, at p. 1128.) As the Supreme Court explained, "When the theory is legally erroneous—i.e., of a kind the jury is *not* equipped to detect—a higher standard must be met for the error to be found harmless. 'These different tests reflect the view that jurors are "well equipped" to sort *factually* valid from invalid theories, but ill equipped to sort *legally* valid from invalid theories.'" (*Aledamat*, at p. 7.)

"In determining whether a legally inadequate theory was conveyed to the jury here, we must ask whether there is a "'reasonable likelihood'" that the jury understood the kill zone theory in a legally impermissible manner. [Citations.] In doing so, we consider the instructions provided to the jury and counsel's argument to the jury." (*Canizales, supra*, 7 Cal.5th at p. 613.) The *Canizales* court observed the instruction given to the jury did not define a kill zone "[b]eyond its reference to a 'particular zone of harm,'" and the prosecutor "substantially aggravated the potential for confusion" by defining the kill zone overbroadly "as an area in which people 'can get killed' or are in a 'zone of fire.'" (*Id.* at pp. 613, 614.) The court concluded the "error was one of federal constitutional magnitude." (*Id.* at p. 615.)

Here, as in *Canizales*, the trial court instructed the jury that to convict Rayford and Glass it had to find the shooters took "a direct but ineffectual act . . . towards killing another human being" and had "a specific intent to kill unlawfully another

38

human being." The court instructed further that "[a] person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed the 'kill zone.'" As in *Canizales*, the instruction failed to define the term "kill zone," other than its reference to "a particular zone of risk." (See *Canizales, supra*, 7 Cal.5th at p. 613.) The remainder of the instruction did not remedy this defect. It stated, "The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity." By defining the kill zone as a "zone of risk," the instruction erroneously allowed the jury to convict Rayford and Glass if the evidence showed they intended to subject individuals in the "zone of risk" to a risk of harm, regardless of whether they intended to kill the individuals in order to kill the primary target.[19] (See *People v. McCloud* (2012) 211 Cal.App.4th 788, 802, fn. 7 ["By referring repeatedly to a 'zone of risk,' [CALJIC No. 8.66.1] suggests to the jury that a defendant can create a kill zone merely by subjecting individuals other than the primary target to a risk of fatal injury. . . . [T]hat is not correct."].)

---

[19] The instruction also failed to require the shooter have a primary target for the kill zone theory to apply. This court's statement in *Rayford I*, that "[s]imply because *Bland* involved a single primary target does not necessarily mean the theory of concurrent intent only applies when a primary target is identified," is an incorrect statement of law in light of *Canizales*. (*Rayford I, supra*, B179017; see *Canizales, supra*, 7 Cal.5th at p. 608 ["When the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim, however, evidence of a primary target is required."].)

The prosecutor's closing argument compounded the error. The prosecutor described the theory of concurrent intent as when the defendant "mainly intend[s] to kill one [person], but at the same time, [he] can be found guilty of intending to kill everyone in what's known as a kill zone, a zone of risk." The prosecutor continued, "The idea was whether Rayford and Glass intended to ensure harm to their intended victim in a way that exposed everyone in their vicinity to harm." The prosecutor added that Perry was not a "primary victim" because he was not in the house, but instead the primary victims were Sheila, Darrel, and Kimberly because, as to the latter two, "they were struck by gunfire." Further, the prosecutor argued the kill zone was not limited to the front door area but encompassed "the majority of the living space in this house."

By referring to a "zone of risk" and defendants' intent to "expose[] everyone in their vicinity to harm," "[t]he prosecutor's definition of the kill zone . . . was significantly broader than a proper understanding of the theory permits" and "essentially equated attempted murder with implied malice murder," which cannot support an attempted murder conviction. (*Canizales, supra*, at p. 614.) This was reinforced by the prosecutor's reference to Darrel and Kimberly as two of the three "primary victims," conflating a victim with a target. And finally, by arguing the "zone of risk" included the majority of the house, the prosecutor was suggesting the family in the house beyond the reach of the gunfire could be included in the kill zone because they were within the zone of risk. "Thus, the prosecutor's argument had the potential to mislead the jury to believe that the mere presence of a purported victim in an area in which he or she could be fatally shot is sufficient for attempted murder liability

40

under the kill zone theory. So misled, the jury might well have found factual support for what was effectively an 'implied malice' theory of attempted murder without detecting the legal error." (*Ibid.*)

Under these circumstances, we cannot conclude beyond a reasonable doubt the jury would have convicted Rayford and Glass of 11 counts of attempted premeditated murder absent the erroneous instruction. As to Sheila (count 2), Donisha (count 4), Terry (count 7), and Darrel (count 3), who were identified in trial testimony as standing outside the house on the grass or near the front door when the shooting began,[20] the shooters fired bullets toward and around them. It is possible the jury convicted as to these counts based not on the kill zone theory but on direct evidence of the shooters' intent to kill, which would be legally permissible. As we noted in *Rayford I*, "substantial evidence supports a finding there were several potential primary targets," including Sheila, Terry, and Donisha. (*Rayford I, supra*, B179017.) However, we cannot tell from the evidence which of the group in front of the house were the primary targets. The jury may have found the primary target was Terry, whom

---

[20] In *Rayford I*, we stated "Sheila's three daughters, her two neighbors and some of her nieces and nephews followed her outside the house" immediately before the confrontation. (*Rayford I, supra*, B179017.) However, a closer review of the trial testimony reveals Sheila and Donisha did not identify who other than Terry and Darrel followed Sheila and Donisha outside. No testimony at trial places Sheila's two other daughters, Shadonna and Shontel, or any of Sheila's nieces or nephews outside the house when the shooting began. Although Sheila referenced the "kids" who were present, she did not identify who was present or how many.

41

De'Antwan accosted and physically attacked. Or it may have found Donisha or Sheila was the primary target for protecting Perry. But the jury alternatively could have focused on the two who were injured—Kimberly and Darrel—whom the prosecutor argued were "primary victims." Without knowing which primary target the jury selected as the basis for its application of the kill zone theory, we cannot determine as to which individuals the jury found the shooters acted with the specific intent to kill their primary target.

As to the remaining named victims, those whose precise whereabouts within or outside the house at the time of the shooting are unknown, the likelihood the jury based its verdict on a legally erroneous theory is even greater. There is no evidence these victims were anywhere near Sheila, Donisha, Terry, or Darrel when the shooting began. Although a bullet struck Kimberly (count 1) in the second floor west bedroom, there is no evidence to support a finding the shooters had the specific intent to kill Kimberly. The same is true for those whose location inside the house is unknown, including Jasmin (count 5), Ebony (count 8), Jerterry (count 9), Donte (count 10), and Jermaine (count 11).[21] In light of the entire record, it is not clear beyond a reasonable doubt the jury would have returned the same verdict

---

[21] Donisha testified Glass fired into the front window where one of her cousins "was looking out." However, Donisha did not identify this cousin by name, and he or she is not identified elsewhere in the record. We therefore do not know whether this cousin was a named victim, or another cousin was home at the time of the shooting but not named in the information, such as Kevante.

absent the error.  (*Canizales, supra*, 7 Cal.5th at p. 615.)  We therefore vacate Rayford's and Glass's convictions of the 11 counts of attempted premeditated murder.[22]

---

[22]     Although we asked the parties to address at oral argument the options that would be available to the superior court if we vacate Rayford's and Glass's convictions, the resolution of how this case will proceed should be determined by the superior court in the first instance.  We do not address Rayford's additional contentions he is actually innocent and the trial court erred in failing to instruct the jury that Rayford, as an aider and abettor, may be guilty of a lesser offense than his principals.  Rayford did not raise these contentions in his May 29, 2015 petition.  We agree with the People these issues are beyond the scope of the Supreme Court's transfer order.  (See Cal. Rules of Court, rule 8.200(b)(2) [following transfer from Supreme Court "[s]upplemental briefs must be limited to matters arising after the previous Court of Appeal decision in the cause, unless the presiding justice permits briefing on other matters"]; *Dahms v. Downtown Pomona Property & Business Improvement Dist.* (2009) 174 Cal.App.4th 708, 711, fn. 1 [declining to consider on remand from Supreme Court "any arguments raised in the supplemental briefs that could have been raised in the parties' original briefs"].)  Likewise, we do not address Glass's additional contentions he received ineffective assistance of trial counsel, he is actually innocent, and his sentence of 11 consecutive life sentences for a nonhomicide offense he committed at age 17 is an unconstitutional sentence of life without parole—the Supreme Court's denial of Glass's March 9, 2017 petition for writ of habeas corpus was without prejudice to filing the petition in this court only for consideration in light of *Canizales*.  (*In re Glass, supra*, S240520.)

## DISPOSITION

Rayford's and Glass's petitions for writs of habeas corpus are granted, and each defendant's 11 convictions for attempted willful, deliberate, and premeditated murder are vacated.


                                                   FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.